CHRISTOPHER D. SULLIVAN (State Bar No. 148083)
**DIAMOND McCARTHY LLP**
150 California Street, Suite 2200
San Francisco, CA 94111
Phone: (415) 692-5200
Fax: (415) 263-9200
Email: csullivan@diamondmccarthy.com

SAMUEL BONDEROFF (*Pro Hac Vice*)
**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Phone: (212) 742-1414
Fax: (212) 742-1177
Email: samuel@zamansky.com

*Attorneys for Jean E. Henry*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JEAN E. HENRY, individually and derivatively on behalf of MCKESSON CORPORATION,<br><br>                    Plaintiff,<br><br>          vs.<br><br>BRIAN J. TYLER, JAMES BEER, EDWARD A. MUELLER, N. ANTHONY COLES, M. CHRISTINE JACOBS, DONALD R. KNAUSS, MARIE L. KNOWLES, SUSAN R. SALKA, JOHN H. HAMMERGREN, WAYNE A. BUDD, ANDY D. BRYANT, ALTON F. IRBY, III, and DAVID M. LAWRENCE,<br><br>          Defendants,<br><br>MCKESSON CORPORATION, a Delaware Corporation<br><br>          Nominal Defendant | Case No. 3:19-cv-2869-CRB<br><br><br>**SECOND AMENDED VERIFIED SHAREHOLDER DERVIATIVE COMPLAINT**<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

1.      Plaintiff Jean E. Henry ("Henry" or "Plaintiff"), by and through her undersigned counsel, submits this Verified Stockholder Derivative Complaint for breach of fiduciary duty and waste of corporate assets against certain of the officers and directors of McKesson Corporation. ("McKesson" or the "Company"). Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This Complaint is also based on the investigation of Plaintiff's counsel, which included a review of, among other things, the books and records provided by McKesson pursuant to Delaware General Corporation Law Code § 220 and Delaware Common Law, public filings with the U.S. Securities and Exchange Commission ("SEC"), news reports, press releases, and other public sources. Plaintiff also relies on, *inter alia*, (i) the results of a two-year investigation by the U.S. Department of Justice ("DOJ") into price-fixing in the pharmaceutical industry; (ii) the investigation and consolidated action brought by forty-seven state attorneys general ("AGs"), together with the District of Columbia and Puerto Rico, alleging antitrust conspiracies regarding generic drug pricing, *In re Generic Pharms. Pricing Antitrust Litig.*, No. 17-3786 (E.D. Pa. Jun. 18, 2018) (ECF No. 15) ("AG Complaint"); (iii) the complaint filed by forty-four states against twenty generic drug manufacturers alleging price fixing in the generic drug market on May 10, 2019, *State of Connecticut, et al. v. Teva Pharm. USA, Inc., et al.* (the "State Complaint"); (iv) the consolidated securities fraud class action pending in federal district court for the Northern District of California, *Evanston Police Pension Fund, et al, v. McKesson Corp., et al.*, 3:18-cv-06525-CRB (N.D. Cal. April 9, 2019) (the "Securities Fraud Class Action Complaint"), along with subsequent filings and orders in that case; and (v) a separate second amended antitrust class action against McKesson and several of the same manufacturing companies named in the AG Complaint in the Eastern District of Pennsylvania, which was dismissed with permission to seek leave to amend, *In Re: Generic Pharmaceuticals Pricing Antitrust Litig.,* MDL 2724, Civ. No. 2:18-cv-04137-CMR (E.D. Pa. April 1, 2019) (the "Antitrust Complaint").

///

1   **I.   SUMMARY OF THE ACTION**

2   2.   This action arises out of a generic drug price-fixing and market allocation

3   conspiracy that one state assistant attorney general described as "most likely the largest

4   cartel in the history of the United States."

5   3.   As the AG Complaint details, McKesson has been implicated in this

6   conspiracy. It has been revealed in private text messages that McKesson was "strategically

7   aligned" with a company called Heritage Pharmaceuticals Inc. ("Heritage"). McKesson's

8   "strategically aligned" partner Heritage is one of the primary defendants in the AG

9   Complaint that was filed in June 2018, where Heritage stands accused of illegal generic

10  drug price-fixing. Two executives of Heritage were also criminally charged by the DOJ in

11  a federal action that was filed in December of 2016. These executives who were

12  "strategically aligned" with McKesson have pleaded guilty.

13  4.   Indeed, the state AGs specifically implicated McKesson and other

14  wholesalers in an October 31, 2017 press release, stating in relevant part: "[T]he states'

15  investigation involves allegations of ***conspiracy and collusion within the entirety of the***

16  ***generic drug industry, and wholesalers***, distributors and other customers are certainly

17  players ***within the industry***."

18  5.   As Connecticut Assistant AG Michael E. Cole stated, "Rather than the

19  wholesalers being the gatekeeper, it was ***the fox guarding the hen house***" during this

20  conspiracy.

21  6.   The Antitrust Complaint that was filed by the state AGs makes reference to

22  an entity called "Wholersaler A," which allegedly worked with Heritage in connection with

23  its Doxy DR scheme. Upon information and belief, and based on the description of

24  Wholesaler A's involvement with Heritage and Doxy DR, it appears that "Wholesaler A"

25  is McKesson.

26  7.   In addition to McKesson itself, a McKesson subsidiary and generic drug

27  manufacturer called NorthStar Rx ("NorthStar") further participated in this wide-ranging

28  price-fixing conspiracy that has been the subject of Congressional and criminal

3

investigation. One investigation conducted by the Pension Trust Fund for Operating Engineers has shown that NorthStar engaged in a "suspicious pricing pattern" that included (1) "massive lockstep price hikes" on the drugs leuflunomide and baclofen; and (2) setting the prices of the drugs amitriptyline, enalapril, digoxin, and fluocinodine at "inflated collusive levels" that were "set by its co-conspirators." Indeed, this investigation purportedly shows that "*at least 84 drugs sold by McKesson and/or NorthStar . . . bear the telltale 'markers' of price-fixing*."

8.      Throughout the course of these illegal conspiracies, Defendants artificially inflated McKesson's share price, and then engaged in a massive insider trading binge, *selling hundreds of millions of dollars' worth of company stock at artificially inflated prices* in violation of their fiduciary duties. Indeed, Defendant Hammergren—the CEO and Chair of McKesson's board of directors—*personally sold $287 million worth of McKesson common stock* at artificially inflated prices. Defendants Hammergren, Budd, Irby, Jacobs, and Knowles (the "Insider Trading Defendants") each sold substantial amounts of McKesson stock while in possession of material non-public information.

9.      Although McKesson has not been individually charged by government entities for antitrust violations, McKesson's 10-K statement for the fiscal year ending on March 31, 2019 warns investors that "we and certain of our subsidiaries may become involved in various legal and regulatory proceedings involving . . . antitrust . . . and other various claims." In addition to facing private litigation, McKesson notes that "[s]ome states and other governmental entities have indicated that they are considering filing similar suits." According to the AG Complaint, "[t]his overarching agreement is widespread across the generic drug industry and is *broader than the Defendants named in this Complaint*." Indeed, the Attorneys General have stated that they anticipate filing additional complaints and that "the current litigation is just the tip of the iceberg."

10.     There has also been private litigation that focuses Defendant's business. For instance, on March 29, 2019, the Southern District of New York upheld a securities fraud complaint against drug manufacturer Mylan N.V., relating to certain misstatements

4

regarding the  generic drug doxycycline hyclate delayed release ("Doxy DR"). *See In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198 (S.D.N.Y. 2019). This is the same drug for which McKesson allegedly assisted Heritage to maintain elevated pricing. In other words, at least one federal court has already found that there are plausible allegations that there was an antitrust conspiracy whereby McKesson played an important role.

11.    Through this action, Plaintiff, an investor in McKesson, seeks to hold McKesson's board of directors and certain of its officers accountable for affirmatively concealing the truth behind a sudden and temporary increase—and subsequently harmful decrease—in McKesson's financial performance, and for failing to protect McKesson from becoming involved in an industry-wide, anticompetitive price-fixing conspiracy.

12.    McKesson's board of directors breached their fiduciary duties by ignoring unmistakable red flags that should have caused the board to take immediate action to protect the Company from its involvement in illegal and anticompetitive activity.

13.    As a direct result of Defendants' breach of their fiduciary duties, McKesson's stock price artificially increased during the period of illegal and collusive price-fixing in the pharmaceutical industry. When the price-fixing scheme ended as the result of intense government scrutiny, ***McKesson's artificially inflated stock price collapsed by 42%***, damaging McKesson and its investors, and ***wiping out approximately $4.5 billion in market capitalization***. Defendants Hammergren and Beer sought to conceal the price-fixing scheme by making false and misleading public comments attributing the price increases to "supply disruptions" that were purportedly driving up generic drug pricing. Defendants knew, or should have known, that these statements were false and misleading when they were made.

14.    Demand is excused in this action because Defendants utterly failed in their oversight duties, despite numerous red flags that should have alerted the board of directors to take action.

## II.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is a diversity of citizenship and the amount in controversy exceeds $75,000. The Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965.  This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

16.    Venue is proper in this District under 28 U.S.C. § 1391(b) because McKesson maintained a principal place of business in San Francisco County, California, and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in San Francisco County, California.  Because a significant amount of the harm, as well as important evidence, is located within this jurisdiction, this is the best venue for this action. Each defendant has sufficient contacts with this jurisdiction that venue in this jurisdiction is appropriate. Moreover, venue is proper because, upon information and belief, some of the defendants reside in San Francisco County.

17.    This case was initially filed in San Francisco County Superior Court, State of California, on May 21, 2019, under the caption *Jean E. Henry, individually and derivatively on behalf of McKesson Corporation v. Brian J. Tyler et al.*, Case No. CGC-19-576119. On May 23, 2019, Defendants filed a Notice of Removal of Action Under 28 U.S.C. Sections 1332, 1441, and 1446, whereby Defendants stated that they "consent to the removal of this action to federal court."

## III.    INTRADISTRICT ASSIGNMENT

18.    This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2, because a substantial part of the events or omissions giving rise to Plaintiff's claims arose in the counties served by the San Francisco Division.

## IV.    THE PARTIES

19.    Plaintiff is the beneficial owner of McKesson stock and has held the stock continuously throughout all times relevant to this action, as detailed in the attached Verification.

20.     Defendant McKesson is a Delaware corporation, which until April 1, 2019 when it re-located to Las Colinas, Texas, had its principal executive offices at One Post Street, San Francisco, California 94104. According to its form 10-K, filed with the SEC on May 24, 2018, McKesson was the sixth largest United States corporation and the largest pharmaceutical distributor in the United States, with more than 40,000 customers.

21.     McKesson operates through two segments: McKesson Distribution Solutions ("Distribution Solutions") and McKesson Technology Solutions ("Technology Solutions"). Distributions Solutions, which is most relevant to this Complaint, accounted for 99% of McKesson's revenue for the 2018 fiscal year, as stated in McKesson's 2018 financial results. The Distribution Solutions segment distributes branded and generic pharmaceutical drugs and other healthcare-related products nationally and internationally and provides practice management, technology, clinical support, and business solutions to community-based oncology and other specialty practices. Technology Solutions provides clinical, financial, and supply chain management solutions to healthcare organizations.

22.     Since 2002, McKesson has also wholly owned NorthStar, a private label generic drug manufacturer.

23.     Defendant John H. Hammergren ("Hammergren") was the President and Chief Executive Officer ("CEO") of McKesson from 2001 to 2019, and was Chairman of McKesson's board of directors at times relevant to this action. Defendant Hammergren has exercised substantial control and influence over McKesson at all times relevant to this action, up until his recent departure. At the time of his recent departure from McKesson, Hammergren had earned the highest total CEO lifetime pay ever recorded, standing at an astonishing ***$800.1 million*** over almost 20 years, according Equilar Institute, which provides data on executive compensation, board recruiting, and shareholder engagement.[1] Fittingly, McKesson ranks in the ***bottom 3%*** of companies in the Russell 3000 index with respect to "pay-for-performance" policies. Defendant Brian J. Tyler ("Tyler") is the current

---

[1] https://www.equilar.com/blogs/418-equilar-ceo-tracker-2019-q1.html

SECOND AMENDED COMPLAINT

President and CEO of McKesson and a member of McKesson's board of directors. Tyler has been at McKesson since 1997. From 2015 to 2018, Tyler served as President of McKesson's North American Pharmaceutical Distribution and Services division ("NAPDS"). In that position, Tyler "had overall leadership responsibility for McKesson's pharmaceutical distribution and related businesses in North America, including McKesson U.S. Pharmaceutical, McKesson Canada, McKesson Specialty Health and McKesson Pharmacy Systems & Automation[,]" according to his biography on McKesson's website. In 2018, Tyler was promoted to Chief Operating Officer ("COO") of McKesson for a short period before being promoted to CEO in 2019.

24.    Defendant James Beer ("Beer") was the Vice President and Chief Financial Officer ("CFO") of McKesson from 2013 to 2018, and a member of McKesson's Executive Committee.

25.    Defendant Edward A. Mueller ("Mueller") is the Independent Chair of McKesson's board of directors, where he has served since 2008. Mueller is also a member of the Compensation Committee and the Governance Committee. Prior to joining McKesson, Mueller was the former CEO of Qwest Communications.

26.    Defendant N. Anthony Coles ("Coles") has been a director of McKesson since April 2014. Coles is chair of the Compensation Committee and a member of the Finance Committee. Currently, Coles also serves as the CEO of Yumanity Therapeutics, a company that develops treatments for neurodegenerative disorders. Prior to his time at McKesson and Yumanity Therapeutics, Coles was the former CEO of Onyx Pharmaceuticals.

27.    Defendant M. Christine Jacobs ("Jacobs") has been a director of McKesson since January 1999. Jacobs is a member of the Audit Committee, the Compliance Committee, and the Governance Committee. Jacobs is the former CEO of Theragenics Corp., a manufacturer of medical devices serving the cancer treatment and surgical markets.

28.     Defendant Donald R. Knauss ("Knauss") has been a director of McKesson since October 2014. Knauss is chair of the Finance Committee and a member of the Audit Committee. Knauss is also the former CEO of Clorox Corp, a manufacturer and marketer of consumer and professional products including such brands as Burt's Bees, Formula 409, Glad, Hidden Valley, Liquid-Plumr, and Pine-Sol, among others.

29.     Defendant Marie L. Knowles ("Knowles") has been a director of McKesson since 2002. Knowles is chair of the Audit Committee and a member of both the Compliance Committee and the Finance Committee. Knowles is also the former CFO of Atlantic Richfield Company, an oil company.

30.     Defendant Susan R. Salka ("Salka") has been a director of McKesson since October 2014. Salka is chair of the Governance Committee and a member of the Compensation Committee, and a former member of the Audit Committee. Salka is also the CEO and President of AMN Healthcare Services, a healthcare staffing company.

31.     Defendant Wayne A. Budd ("Budd") served as a director of McKesson from 2003 until 2017. During his time at McKesson, Budd was a member of McKesson's Corporate Governance Committee from 2004 until 2017 and a member of the Audit Committee from at least 2009 to 2017. Budd currently works as Senior Counsel at Goodwin Proctor.

32.     Defendant Andy D. Bryant ("Bryant") served as a director of McKesson from 2008 until 2018. Bryant was a member of the Audit Committee from at least 2009 to 2014, the Finance Committee from at least 2009 to 2016, and the Compensation Committee in 2015 and 2016. Bryant is also the former CFO of Intel, an American multinational technology company and the world's second largest producer of semiconductor chips.

33.     Defendant Alton F. Irby III ("Irby") served as a director of McKesson from 1999 to 2016. During his time at McKesson, Irby was a member of the Audit, Compensation, and Finance Committees. Irby is also the founding partner of London Bay Capital LLC, a private equity firm, and Tricorn Partners LLP, a privately held investment bank.

34.     Defendant David M. Lawrence, MD, MPH ("Lawrence") served as a director of McKesson from 2004 until 2016. During his time at McKesson, Lawrence was a member of the Compensation and Finance Committees. Lawrence is also a Member of the Advisory Board at Medial EarlySign Ltd., a company using artificial intelligence to develop new personalized care management opportunities, and advisor to Physic Ventures, LLC, an institutional venture capital firm; Artiman Management LLC, an early state venture capital fund; and Ivivi Health Sciences, LLC, a company developing portable electrotherapy devices for post-operative care.

35.     All of the defendants in this action are collectively referred to as the "Defendants."

36.     As board members, the Defendants are lavishly compensated. According to a recent proxy statement from McKesson, each Board member receives approximately $300,000 in stock awards and cash in total compensation for each year they serve on the Board.

## V.     BOOKS AND RECORDS DEMAND

37.     On or about December 21, 2018, counsel for Plaintiff served a verified demand on McKesson for production of its relevant "books and records" pursuant to Delaware General Corporation Law Code §220 and Delaware Common Law (the "Demand").

38.     McKesson produced a limited and heavily redacted set of records on April 1, 2019, and April 10, 2019, subject to a confidentiality agreement between the parties.

39.     McKesson's production, though heavily redacted and short of what was called for, nevertheless was sufficient to corroborate the overwhelming evidence detailed in the AG Complaint, showing a conspiracy to fix the prices of certain generic drugs. The production further confirmed that the Defendants had knowledge of and involvement in the wrongdoing alleged in this Complaint.

40.     The Defendants' knowledge of and involvement in the wrongdoing alleged herein excuses Plaintiff from making a demand on them before commencing this action

because it would be futile for her to do so. The particular allegations supporting this determination are set forth below.

## VI.   SUBSTANTIVE ALLEGATIONS

### A. McKesson and the Generic Drug Business

41.     Generic pharmaceuticals—as opposed to brand-name drugs—make up 89% of all prescriptions filled in the United States. Generic drugs serve an important role in the healthcare system because they are available at a much lower cost than brand-name products, which benefit from a monopoly in the marketplace until the patents for such products expire. Historically, generic drugs were considered the "white knight of American health care" because they were among the few consistently affordable components of the healthcare market. In the past six years, however, prices for dozens of generic drugs have abruptly risen. For example, the price of the generic asthma drug mannitol rose by over 2,000% between 2011 and 2015.

42.     The three largest pharmaceutical drug wholesalers—McKesson, Cardinal Health, and AmerisourceBergen—have dominated a relatively stable wholesale market for over a decade. These three wholesalers together control over 85% of the drug market in the United States and accounted for $511 billion in 2018 sales. This market is truly massive.

43.     As a wholesaler, McKesson purchases prescription drugs from manufacturers and sells them to independent pharmacies, healthcare providers, and national retail chains. Essentially, McKesson acts as a middle-man, or as a conduit for the manufacturers of generic drugs (like the defendants named in the AG Complaint) to reach retailers and, ultimately, the general public.

44.     Generic drugs are "commodity products," meaning that McKesson can purchase its inventory from a number of competing manufacturers, which, in theory, should drive price competition. Moreover, as generic drug manufacturers compete for market share, prices should decrease, not increase. This system has worked relatively well since 1984 when Congress passed the Hatch-Waxman Act, which established several practices intended to facilitate the marketing of generic pharmaceuticals.

45.      Beginning in approximately 2013, however, several stakeholders on the retail side of the pharmaceutical industry began to notice a rapid escalation in the price of generic drugs, some of which had been sold generically for years at consistent pricing.

46.      Between July 2013 and July 2014 alone, nearly 10% of generic drugs ***more than doubled in price***, according to data from the U.S. Centers for Medicare and Medicaid Services. During the same time period, the price of more than 1,200 generic drugs ***increased by an average of 448%***.

47.      In January 2014, in response to this dramatic surge in generic drug pricing, the National Community Pharmacists Association ("NCPA"), an organization representing over 22,000 independent pharmacies, wrote a letter to Congress seeking an oversight hearing into the issue. The NCPA told Congress that during the second six months 2013, 77% of its members reported 26 or more instances of a "dramatic and unprecedented" increase in generic drug prices.

48.      Several factors make the pricing of generic drugs susceptible to collusion.

49.      First, there is a high degree of industry concentration for most generic drugs. In other words, there are relatively few companies involved in bidding on, and negotiating, the prices for generic drugs.

50.      Second, significant capital, regulatory, and intellectual property barriers prevent newcomers from entering the generic drug market, which naturally keeps competition low.

51.      Third, there is an "inelastic demand" for generic drugs. In other words, the demand for generic drugs, and for pharmaceuticals in general, does not necessarily go down when the price increases. This is because the decision to purchase a particular drug is often quite literally a life-or-death decision.

52.      Fourth, generic versions of drugs are highly standardized and interchangeable. For a generic drug to be FDA approved, it must be therapeutically equivalent to the branded version of the same drug. This means that one generic drug can

1  be substituted for another with the expectation that the substituted version will produce the

2  same clinical effect, and will have the same safety profile.

3      53.    Finally, generic drugs are susceptible to collusive behavior because

4  manufacturers and wholesalers frequent the same conferences and trade shows and, as the

5  AG Complaint alleges, have numerous opportunities to communicate about upcoming bids,

6  markets, and other competitively sensitive information.

7          **B.  The Generic Drug Price Fixing Scheme**

8      54.    The sharp and sudden rise in the price of generic drugs in 2013 and 2014 did

9  not go unnoticed by government officials.

10     55.    In approximately July 2014, the Connecticut Attorney General's office

11  served subpoenas on a pharmaceutical manufacturer named Lannett Company, Inc.

12  ("Lannett"). These subpoenas were issued pursuant to an investigation into whether

13  Lannett had engaged in activities that resulted in either fixing, maintaining, or controlling

14  prices of digoxin, or allocating and dividing customers or territories relating to the sale of

15  digoxin. Notably, Lannett had been an alleged co-conspirator in a scheme that implicates

16  McKesson's subsidiary, NorthStar.

17     56.    Shortly after these subpoenas were served, on November 3, 2014, the DOJ

18  served Lannett with a grand jury subpoena relating to a federal investigation of the generic

19  pharmaceutical industry regarding possible violations of the Sherman Act.

20     57.    Neither of these investigations occurred in vacuum. By at least November

21  24, 2014, the *New York Times* had reported on both investigations, as well as on

22  Congressional hearings that were taking place concerning pharmaceutical pricing. The

23  initiation of these investigations by two separate government entities, and the press these

24  investigations received, should have been red flags to McKesson's officers and board of

25  directors that the Company's price-fixing and market allocation scheme could not continue,

26  and would certainly harm the Company and its shareholders.

27     58.    In December of 2016, the DOJ filed criminal charges against two former

28  executives of Heritage. The DOJ alleged that Heritage's former CEO Jeffrey Glazer and

13

former president Jason Malek sought to collude with competing pharmaceutical manufacturers to allocate the market for the drug doxycycline hyclate from April 2013 to December 2015, and for the drug glyburide from April 2014 to December 2015, which effectively forced consumers to pay collusive and non-competitive prices. In January 2017, Glazer and Malek each pleaded guilty to a two-count price-fixing felony charge in Pennsylvania federal court. Both Glazer and Malek have signed cooperation agreements with the DOJ. Heritage has also initiated a racketeering suit against Glazer and Malek, and announced that it is cooperating with the DOJ's ongoing investigation.

59.    Concurrently, the AGs of 47 states (and the District of Columbia and Puerto Rico) conducted their own investigation into price-fixing in the generic drug marketplace, which has led to a lawsuit against eighteen companies regarding the sale of fifteen generic drugs.

60.    As detailed in painstaking detail in the AG Complaint and the State Complaint, various participants in the generic drugs market engaged in a wide-ranging and illegal conspiracy through which generic drug manufacturers communicated—either in person, by telephone, or by text message—and agreed to collectively raise and/or maintain prices for generic drugs.

61.    The State Complaint alleges that in January 2013, a defendant pharmaceutical company engaged in a six-minute conversation with another pharmaceutical company, and later *that same day* McKesson—seemingly in coordination—arranged for a price adjustment on a certain drug. In April 2013, "[r]ather than competitively bid" for business, another pharmaceutical company defendant conspired in collusive arrangements that involved McKesson. Again in June 2013 and November 2013, the defendants in that lawsuit engaged in collusive arrangements regarding McKesson. Similarly, a former pricing executive working as a confidential witness spoke with certain parties to the lawsuit, and came to a collusive arrangement in July 2014 that involved divvying up business from McKesson and others. In May 2014 the parties engaged in another collusive arrangement involving McKesson, and in August 2014

14

the parties again conspired in a "market allocation scheme" involving McKesson. This pattern of behavior was not mere coincidence.

62.     The AG Complaint alleges that in approximately July 2013, senior executives at some of the largest pharmaceutical manufacturers agreed to cooperate with each other to divide the market so that each manufacturer received its "fair share," as alleged in the AG Complaint. The objective of this conspiracy was to attain a state of equilibrium, where no competitors would be incentivized to compete for additional market share by eroding prices.

63.     As the AG Complaint alleges, this conspiracy was based on so-called "rules of the road," whereby manufacturers agreed to "play[] nice in the sandbox." Specifically, the AG Complaint describes how generic drug manufacturers agreed not to lower prices to gain market share in the face of their competitors' price increases; rather, they allowed each competitor to have a certain percentage of market share "based on the number of competitors in the particular drug market, with a potential adjustment based on the timing of their entry." The AG Complaint alleges that these manufacturers actively monitored and tracked each other's "fair share" of generic drugs, and discussed market allocation with each other with regard to specific drugs.

64.     When a competitor needed to obtain one or more customers to reach its fair share, the competitor with more than its "fair share" would identify and "walk away" from a customer by informing that customer of a significant price increase. The competitor looking to increase its share would then submit an above-competitive bid at an amount slightly less than the original competitor. The competitors then continued to divide up customers until they reached an artificial equilibrium. According to the AG Complaint, the participants in the alleged price-fixing scheme referred to this as a "stable" market. Once the market was "stable," the competitors agreed not to compete on price and, at times, agreed to significantly raise prices in the absence of competition.

65.     In a rational, competitive market, prices are expected to decrease when a new competitor enters the market. However, under the conspiracy alleged by the AGs, even

new competitors would be drawn into the price-fixing scheme. The AGs alleged that as long as the newcomer agreed to charge the fixed prices, existing competitors would agree to "walk away" from specific customers in order make room for the newcomer in the market and the market would reach a new artificial equilibrium. The new competitor's transition into the market was seamless; the new entrant obtained market share and immediately charged an above-competitive price.

66.     Once market equilibrium was reached, the alleged conspirators maintained the status quo in several anti-competitive ways. For example, customers in one drug market might be traded for customers in another drug market in an effort to arrive at a more global "fair share" outcome. Alternatively, competitors might allow price increases on one or more generic drugs in exchange for similar concessions from other competitors on different drugs.

67.     Under the alleged conspiracy, as long as everyone in the "sandbox" played fair, and the manufacturers believed that they had their "fair share," the larger understanding dictated that they would not take advantage of a competitor's price increase by bidding a lower price to take that business.

68.     The agreement among manufacturers to adhere to the rules regarding "fair share" was critical in order to maintain high prices. The AGs allege that if even one competitor refused to follow the "rules of the road," it could lead to unwanted competition and lower prices. In the relatively few instances where a competitor prioritized gaining market share over the larger understanding of maintaining "fair share," that competitor was viewed as "irresponsible," and was spoken to by competitors, according to the AG Complaint.

69.     The AG's allege that generic drug manufacturers routinely communicated and shared information with each other about bids and pricing strategy. This included forwarding bid packages received from a customer (*e.g.*, a Request for Proposal ("RFP")) to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that information.

16

SECOND AMENDED COMPLAINT

70.     Examples of this price fixing scheme are detailed in the AG Complaint. For instance, in December 2014 Teva Pharmaceuticals USA, Inc. ("Teva") was approached by a customer on behalf of one of Teva's competitors. This large retail customer indicated that Teva's competitor was entering the market for a particular drug and was seeking to target specific customers. The AG's allege that the customer specifically requested that Teva give up a specific large customer to the new entrant, and indicated that the new entrant—Teva's competitor— "has promised to play nice in the sandbox." After discussing the matter internally, the AGs allege, a Teva representative responded to the customer: "[t]ell [the competitor] we are playing nice in the sandbox and we will let them have [the targeted customer.]"

71.     The AGs allege that this understanding was frequently followed even in the absence of direct communication between the competitors, demonstrating the universal understanding and code of conduct agreed to by the players in the generic drug market. "Fair share" and "playing nice in the sandbox" became part of the industry lexicon and was used not only in discussions with each other in order to reach agreement regarding allocation of market share and pricing, but also with their customers, such as wholesalers like McKesson.

**C. McKesson's Role in the Generic Drug Price Fixing Scheme**

72.     As the largest United States distributor of generic drugs, McKesson has a very close relationship with the drug manufacturers named in the AG complaint and investigated by the DOJ, including Heritage, where two executives were charged and pleaded guilty to a two-count felony charge, as alleged above in ¶60.

73.     As a middle-man between generic drug manufacturers and retailers, McKesson's role was to negotiate the list prices on behalf of its customers. It purchased generic drugs from the manufacturers at list price and sold them to retailers at list price plus markup. Separately, McKesson negotiated and extracted discounts from the manufacturers as part of its service. Both the discounts and markups were based off of the list prices.

74.     McKesson's profitability was made possible by massive generic drug price hikes, and its wholesale business benefited from the price increases in three ways. First, and most simply, McKesson was able to sell its product at the inflated prices as set by the conspiring manufacturer. Second, McKesson generated revenues by marking up the list price of the drug; the higher the list price, the bigger the mark-up. Third, wholesalers like McKesson usually negotiate discounts from the manufacturer; McKesson collected higher discounts from the manufacturer based on the inflated list prices.

75.     With inventory purchased before the price hike, McKesson received all three benefits because (i) it could sell the inventory that it had purchased prior to the price hike at the higher fixed price, (ii) it received the benefit of the larger mark up on the higher fixed price, and (iii) it received the increased discount from the manufacturer based on the higher fixed price. Even if McKesson purchased the drug at the inflated price, McKesson still benefited from higher markups and discounts. McKesson purchased generic drugs from manufacturers at inflated prices and passed those prices through to the pharmacies while taking an ever-larger "discount" for itself as prices rose.

76.     McKesson was not simply an innocent beneficiary of the price-fixing conspiracy. As described in the AG Complaint, the collusion could not have succeeded without the acquiescence or outright collusion of wholesalers like McKesson to the scheme. According to the AG Complaint, "[t]his overarching agreement is widespread across the generic drug industry and is broader than the Defendants named in this Complaint." Moreover, the AGs specifically implicated McKesson and other wholesalers in an October 31, 2017 press release stating, in relevant part: "[T]he states' investigation involves allegations of conspiracy and collusion within the entirety of the generic drug industry, and wholesalers, distributors and other customers are certainly players within the industry."

77.     As Connecticut Assistant AG Michael E. Cole described, "Rather than the wholesalers being the gatekeeper, it was the fox guarding the hen house …. The wholesaler should be the sentinel here."

78.     Indeed, McKesson's own 10-K statement for the fiscal year ending on March 31, 2019 warns investors that "we and certain of our subsidiaries may become involved in various legal and regulatory proceedings involving . . . antitrust . . . and other various claims." In addition to facing private litigation, McKesson notes that "[s]ome states and other governmental entities have indicated that they are considering filing similar suits."

79.     One of the main defendants in the AG Complaint is Heritage. Heritage had told at least one other manufacturer, Mayne Pharma Inc., that it should not bid on McKesson's business because McKesson was "strategically aligned" with Heritage.

80.     Heritage protected its close McKesson relationship by ceding substantial market share to Defendant Mayne for the sale of Doxycycline Hyclate Delayed Release (a tetracycline-class antimicrobial) only if the latter rescinded its pending, lower-priced bid to McKesson, telling Mayne that it was "strategically aligned" with McKesson.

81.     Further, McKesson was an active participant and sponsor of the many annual trade shows and conferences that facilitated the overarching anticompetitive conspiracy. As detailed in the AG Complaint, anticompetitive agreements were discussed and coordinated at frequent "industry dinners," "girls nights out," lunches, parties, and frequent telephone calls, emails, and texts.

82.     Moreover, because McKesson purchased millions of dollars of generic drugs each year, it is implausible that Defendants would not have been aware an overarching price-fixing conspiracy that was simultaneously enriching the Company and diminishing competitive bidding for its business.

83.     In addition to McKesson's "strategic alignment" with alleged conspirator Heritage, many of McKesson's top officers have moved between top positions at McKesson to top positions at drug manufacturing companies alleged in the AG Complaint to be central players in the price-fixing conspiracy. These personnel exchanges facilitated the conspiracy by providing McKesson and the manufacturing the means to cooperate with one another through the personal relationships of former and current employees.

84.     The chart below illustrates the movement of officers between McKesson and drug manufacturing companies that have been named as defendants in the AG Complaint.

| Employee | Current Position | Former Position |
|---|---|---|
| Terry Pierce | McKesson - Sr. Director for Government Pricing and Reporting | Mylan - Manager Government Pricing and Reporting, 2010-2017 |
| Ed Langill | McKesson Canada – Vice President for National Accounts | Mylan – Senior Director for National Accounts, Director Corporate Accounts 2012-2018 |
| VaiDehi Kannan | McKesson Canada - Director of Finance for Pharmaceutical Solutions | Mylan – Finance Manager 2009-2010 |
| Christopher Hilleary | McKesson – Director for Physical and Electronic Security Programs | Mylan – Director for Global Security 2008-2017 |
| Adam Huang | Mylan – Director of Financial Planning and Analysis 2014-2017 | McKesson – Senior Manager for Financial Planning and Analysis 2006-2014 |
| Preeti Churbock | Mylan – Director of Marketing for Dermatology | McKesson – Product Manager 2006-2017 |
| Heather Paton | Mylan – President of Sales | McKesson - VP Marketing for Health Systems 1990 - 2003 |
| Armen Tekeriam | Teva – VP | McKesson – Director/VP |

SECOND AMENDED COMPLAINT

| Employee | Current Position | Former Position |
| --- | --- | --- |
| Laurie Hughes | Teva – VP U.S. Patient Solutions | McKesson Senior VP – 1997-1998 |

85.   According to allegations in the Securities Fraud Class Action Complaint, and the plaintiff's investigation into the matter, McKesson also used its wholly-owned subsidiary, NorthStar, to drive margin expansion by engaging in collusive activities in the generic drug market.

86.   NorthStar, a generic drug manufacturer that has been owned by McKesson since 2002, was considered by McKesson an entity that would expand its allegedly thin distribution margin by "go[ing] up the chain a little bit if you will, and captur[ing] some of the manufacturing margin."

87.   In addition to expanding McKesson's profit margin, the Company stated that "an important part" of the NorthStar strategy was to enable to the Company to reach "further back in the supply chain to have really . . . more impact and leverage and control" over generic products. Defendant Hammergren stated that NorthStar had enabled McKesson to gain a "closer relationship with the [generic] manufacturers" and served as a vehicle through which "all of McKesson" received reconnaissance on the generics market. As McKesson's CEO explained during the January 30, 2014 earnings call:

> The visibility we get through Northstar enhances our view of the opportunities that exist globally for us as well as some of the challenges that may exist, whether its plant closures, limited supply of raw materials, or other issues that may come along. That Northstar experience helps inform all of McKesson from a sourcing perspective in a very positive way.

88.   Defendant Beer represented to investors that NorthStar operated in a competitive market, and that McKesson was cognizant of NorthStar's role as a competitor to its manufacturing partners:

**Beer on March 3, 2015 at the Cowen Health Care Conference**:

"Where Northstar has tended to develop is around the more mature molecules where you tend to have more players participating in that molecule. And, obviously, we are interested in ways in which we can continue to grow the Northstar business, but we are also very cognizant of its relationship vis-a-vis the broader relationships that we have with our generic manufacturing partner[s]. So I think it's an important balancing act that we play there between our own internal efforts, if you will, and the broader relationships with the general manufacturers where we are using their own names rather than our own."

**Beer on September 16, 2015 at the Morgan Stanley Healthcare Conference**:

"[W]e need to be thoughtful about the balance between growing that private label set of offerings and the relationships that we have with our various manufacturing partners. So there's always going to be a certain amount of balancing act there. Traditionally, NorthStar has focused on the more mature molecules. We tend to have more competitors."

89.     In truth, NorthStar's profitability and success were driven by collusive activities. As alleged in the Securities Fraud Class Action Complaint, at least six drugs sold by NorthStar have indicia of collusion: amitriptyline (used to treat chronic nerve pain and depression), baclofen (used to treat muscular sclerosis and spinal cord injuries), digoxin (used to treat heart failure and irregular heartbeat), enalapril (used to treat high blood pressure, diabetic kidney disease, and heart failure), fluocinonide (used to treat eczema and other skin disorders), and leflunomide (used to treat rheumatoid arthritis).

90.     NorthStar implemented extraordinary coordinated price hikes on leflunomide and baclofen without any meaningful effect on its market share and entered the market following massive collusive price increases and gained market share on amitriptyline, digoxin, enalapril, and fluocinonide without impacting prices. The market participants did not undercut each other's prices to gain market share, as would be expected in a properly competitive market involving commodity-like products.

91.     More specifically, the AG Complaint and the Securities Fraud Class Action Complaint allege how NorthStar raised the price of leflunomide through collusive price hikes. First, the AG Complaint alleges that Heritage and Apotex Corp. colluded to increase the price of leflunomide during the spring of 2014. According to the AG Complaint, during a teleconference on April 22, 2014, a Heritage executive stated that leflunomide was one of the generic drugs slated for a "big price increase." By May 2014, Heritage and Apotex Corp. reached an agreement "to avoid competition and increase prices on Leflunomide." Apotex took a price increase in May 2014, and Heritage took an increase in July 2014.

92.     A second dramatic price increase on leflunomide occurred in 2015; but this time the increase involved NorthStar, Heritage, and Apotex. By the end of July 2015, NorthStar implemented *a 372% price increase* and took the drug from $1.11 per unit to close to $5.20 per unit. Heritage and Apotex followed shortly and raised prices to a similar $5.20 per unit.

93.     From a purely competitive point of view, NorthStar's price increase on leflunomide only makes sense within the context of the price-fixing conspiracy. Heritage and Apotex were much bigger players in the market for leflunomide. Apotex could have taken NorthStar's market by lowering its price. Heritage, on the other hand, was less likely to interfere in NorthStar's market because Heritage was allegedly "strategically aligned" with McKesson. Without anticompetitive collusion, NorthStar should not have been able to raise the price of leflunomide so dramatically and with other major manufacturers quickly following NorthStar's lead.

94.     All of the major players involved in the leflunomide business (including Defendant Hammergren) attended the annual Business and Leadership Conference sponsored by the Healthcare Distribution Alliance in San Antonio, Texas from June 7, 2015 to June 10, 2015, providing an opportunity for McKesson, Heritage, and Apotex to collude on the market allocation and price of leflunomide.

95.     As with leflunomide, the AG Complaint names many of NorthStar's competitors for other drugs as defendants in the AG Complaint. Among NorthStar's

competitors were: (1) Teva for baclofen, enalapril and fluocinonide; (2) Par Pharmaceutical Companies, Inc. for baclofen; (3) Mylan for amitriptyline; (4) Sandoz, Inc. for amitriptyline; (5) Lannett for digoxin; and (6) Sun Pharmaceutical Industries, Inc. for enalapril and fluocinonide.

96.     According to an investigation conducted by the Pension Trust Fund for Operating Engineers, NorthStar entered the market for amitriptyline in April 2015, for enalapril in October 2015, for digoxin in November 2016, and for fluocinonide in January 2017, at "collusive price levels set by its co-conspirators after massive price increases of 268%, 106%, 593%, and 395%, respectively." These dramatic price increases were very closely correlated, such that there is "a less than 1% likelihood that the moves were made by chance."

97.     As a direct result of McKesson's involvement in the price-fixing and market allocation conspiracy, McKesson's profits temporarily soared:



**D. The Defendants Were Either Aware of, or Should Have Been Aware of, the Underlying Misconduct.**

98.     Defendants, as officers and directors of McKesson, were either aware of the underlying misconduct, or were reckless in not knowing of the underlying misconduct, regarding the anti-competitive conduct in the generics market that was central to McKesson's business.

99.     McKesson bragged to shareholders in its 2014 10-K filing (*i.e.*, when the illegal anti-competitive conduct was underway) that "we benefit when the manufacturers increase their prices." This 10-K statement was signed and certified by Hammergren and Beer.

100.    The AG Complaint revealed that, in a series of text messages from April 2014, a salesperson from Heritage—the company whose former executives were criminally charged by the DOJ in December 2016—had commented that McKesson was "strategically aligned" with Heritage at the same time that Heritage was engaged in its illegal conspiracy. Achieving such a "strategic alliance" would necessarily require input from high-level officials at McKesson, including Defendants.

101.    Defendants publicly represented that they kept a close watch over the generic drugs market where this illegal collusion occurred, and publicly noted that they had a "huge data analytics machine within McKesson where we provide data and analytics to products, market share, customer bases that is extremely valuable to the manufacturer."

102.    On October 24, 2013, Defendant Hammergren bragged to investors that McKesson's leadership had "been able to look carefully at the generic purchasing patterns . . . on a country-by-country basis" to quantify "[w]hat goes through distribution, what's controlled spend, what goes through retail, etc." He further elaborated that McKesson had the capabilities of "really getting inside the business model, and that's the magic on how we've been able to continue to grow our program as evidence in the results this quarter."

103.    On June 11, 2014, Defendant Beer bragged that McKesson had been "tapping into the sourcing knowledge that we have put as a centerpiece of our business strategy. And by that, I mean our knowledge of the specific manufacturers, the specific markets for those drugs."

104.    On June 25, 2014, Defendant Beer told investors that McKesson had "obviously analyzed all of the information" regarding various issues relating to the market for generic drugs, had "extensively analyzed" certain issues, and would "continue to monitor" the market on an ongoing basis.

105.   On June 29, 2016, Defendant Hammergren stated that "we are extremely intimate globally to these manufacturers, we understand what they are doing around the world on a real-time basis."

106.   On November 8, 2016 Defendant Hammergren further explained that, McKesson had the ability "to look at generic manufacturers across the globe" with an "opportunity to see how price is behaving in various markets, from a generic perspective."

107.   McKesson's board of directors—which included Defendants Hammergren, Tyler, Mueller, Coles, Jacobs, Knauss, Knowles, Salka, Budd, Bryant, Irby, and Lawrence during the relevant time period—were aware of the collusive and illegal actions by virtue of their position as directors of McKesson. Similarly, Defendant Beer was knowledgeable of the same due to his position as CFO of McKesson.

108.   In McKesson's board of directors meeting minutes, the Company repeatedly discussed the "key themes" and "key drivers" behind the Company's financial results, and the "factors behind" those results. At times, such as the January 25, 2017 meeting attended by Defendants Beer Bryant, Budd, Coles, Hammergren, Jacobs, Knauss, Knowles, Mueller, and Salka, Defendants Beer and Hammergren discussed issues such as "branded and generic pricing pressure" impacting McKesson's business. The contents of these meetings were not shared with the general public, particularly in light of how the Securities Fraud Class Action Complaint details Defendants' public deceptions, but the general language contained in the heavily-redacted minutes that have been produced to Plaintiff in this case reveal that Defendants must have been aware of the underlying improper conduct.

109.   At the May 16, 2017 board of directors meeting, which was attended by Defendants Beer, Bryant, Budd, Coles, Hammergren, Jacobs, Knauss, Knowles, Mueller, and Salka, the board of directors discussed "the competitive landscape" surrounding the pharmaceutical business, and issues related to the pricing of generic drugs. One week later, on May 24, 2017, the same Defendants met for another board of directors meeting, where the "current competitive landscape" was once again discussed, as well as "key factors" affecting "declining price inflation" and "the future outlook in connection with generics

26

price inflation." The temporary pricing inflation that had been spurred on by collusive and illegal behavior was fading, and Defendants were aware of it even if they did not share that information with the public.

110.   At the April 2018 meeting of McKesson's board of directors—a meeting that occurred during the context of a crackdown by government regulators, and which was attended by Defendants Bryant, Coles, Hammergren, Jacobs, Knauss, Knowles, Mueller, and Salka—Defendants bemoaned the "evolving healthcare landscape" and the "potential disruptive entrants in the healthcare market" that long been dominated by collusive activity. Again, these heavily-redacted minutes reveal that Defendants were aware of the problems, even if they did not communicate that information with others.

111.   After the AG Complaint was filed in June 2018, the board of directors met in October 2018. That meeting—which was attended by Defendants Hammergren, Coles, Knauss, Jacobs, Knowles, Mueller, and Salka—discussed "Best Practices for Board Oversight of Compliance with Legal and Regulatory Requirements." Again, the fact that this conversation occurred behind closed doors suggests that Defendants were aware of the problems, but took no meaningful actions to correct them.

112.   Similarly, Defendants' Audit Committee had several meetings that supposedly discussed internal audits, problems within the Company, and factors impacting McKesson's ability (or inability) to achieve its forecasted results. For example, at an October 25, 2016 meeting of the Audit Committee—attended by Defendants Beer, Budd, Hammergren, Knauss, Knowles, and Salka—the Defendants discussed "headwinds" facing "generics profitability within Distribution Solutions," and that "Q2 performance has been impacted by unusual items." The Audit Committee further "commented on factors" impacting "revenue and adjusted operating profit for the U.S. Pharmaceutical business and other businesses within the Distribution Solutions segment." Similarly, on May 16, 2017, the Audit Committee held a meeting attended by Defendants Beer, Budd, Knauss, Knowles, and Salka, in which they discussed "key drivers of Distribution Solutions and Technology Solutions Q4 results," and "commented on factors behind the results." These

27

high-level descriptions of general non-public conversations suggest that Defendants were aware of the problems the Company faced, but took no meaningful actions to prevent the Company from engaging in the collusive behavior that is at the heart of this lawsuit.

113.   In addition to the allegations outlined above, many of McKesson's top officers have moved between top positions at McKesson to top positions at drug manufacturing companies alleged in the AG Complaint to be central players in the price-fixing conspiracy.

114.   As a further indicator of Defendants' awareness of these underlying internal problems, Defendants engaged in a ***massive campaign of insider trading, selling off millions of dollars' worth of McKesson stock*** when the share price was artificially inflated due to the underlying misconduct. These stock sales indicate a breach of fiduciary duty.

115.   Defendant Hammergren personally ***sold over $200 million*** worth of McKesson common stock in 2014 and 2015 at times when McKesson's stock price was inflated by Defendants' breaches. Upon information and belief, these sales were made while in possession of material non-public information.

116.   After not selling any McKesson stock in 2013, Defendant Irby ***sold over $2 million*** worth of McKesson common stock from 2014 to 2016. Upon information and belief, these sales were made while in possession of material, non-public information.

117.   After not selling any McKesson stock from 2010 through 2013, Defendant Budd ***sold over $700,000*** worth of McKesson common stock from 2014 to 2016. Upon information and belief, these sales were made while in possession of material, non-public information.

118.   After not selling any McKesson stock in 2013, Defendant Jacobs ***sold over $670,000*** worth of McKesson common stock from 2014 to 2016. Upon information and belief, these sales were made while in possession of material, non-public information.

119.   Defendant Knowles also ***sold over $505,000*** worth of McKesson common stock from 2014 to 2016. Upon information and belief, these sales were made while in possession of material, non-public information.

120.    Defendant Tyler has also recently engaged in a pattern of insider selling. After a lengthy period without a record of any sales, Tyler sold **more than $1.5 million** worth of McKesson common stock in 2019 and 2020. Upon information and belief, these sales were made while in possession of material, non-public information.

### E. Defendants Misled Investors through Materially False and Misleading Statements Issued to Investors and in SEC Filings.

121.    In order to conceal the price fixing scheme from investors, Defendants Hammergren and Beer repeatedly misrepresented the causes of McKesson's outstanding performance throughout the relevant time period. In doing so, the Defendants Hammergren and Beer caused McKesson's stock to artificially inflate. This artificial inflation has, in turn, subjected the Company to substantial liability in the Securities Fraud Class Action Complaint.

122.    Hammergren and Beer repeatedly claimed that McKesson's improved profit growth resulted from Hammergren's diligence and persistent oversight of generic pricing and attributed the rise in generic pricing to vague causes involving "supply disruption" and "supply shortages." These misrepresentations hid from investors the truth that McKesson's success was built on illegal and anticompetitive price fixing and market allocation.

123.    On McKesson's October 24, 2013 earnings call, Hammergren told investors that he had "been able to look carefully at the generic purchasing patterns on a country-by-country basis" in order to quantify '[w]hat goes through distribution, what's controlled spend, what goes through retail, etc." According to Hammergren, McKesson's improved financial outlook was not the result industry wide price fixing but of "really getting inside the business model, and that's the magic on how we've been able to continue to grow our program as evidence in the results this quarter."[2]

---

[2] McKesson's fiscal year begins on April 1 of each year, and, therefore, the first quarter of McKesson's 2014 fiscal year began on April 1, 2013.

124.    On October 24, 2013, McKesson filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the second quarter of its fiscal year ending in 2014 (the "Q2 2014 8-K"). McKesson (i) reported second quarter GAAP earnings per diluted share of $1.74; (ii) reported adjusted earnings per diluted share from continuing operations of $2.27; and (iii) provided adjusted earnings per diluted share from continuing operations guidance for fiscal year 2014 of $8.40 to $8.70 and also reported quarterly gross profits of $2 billion on revenues of $33 billion, $28.1 billion of which came from McKesson's NAPDS. The total reported revenue represented an 11% increase over the same period in the prior fiscal year.

125.    On the same day, McKesson filed a Form 10-Q with the SEC reiterating the financial results previously announced in the Q2 2014 8-K and reporting its financial and operating results for the second quarter of its fiscal year ending in 2014.

126.    Soon thereafter, Hammergren and Beer misleadingly attributed the spike in generic drug prices to "supply disruption" issues. Speaking at the November 12, 2013, Credit Suisse Healthcare Conference, Hammergren reported that "there has clearly been some supply issues associated with generics in the market and some of those supply issues might have caused more price inflation on certain products than might have otherwise existed in a normal steady state." Hammergren reiterated this rationale on January 13, 2014, while speaking at the J.P. Morgan Healthcare Conference: "It is not all the manufacturers and it is not all the product. It is in a very small area and we think a lot of that price opportunity has been delivered to the manufacturers because of issues associated with the supply."

127.    On January 30, 2014, McKesson filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the third quarter of its fiscal year ending in 2014 (the "Q3 2014 8-K"). McKesson (i) reported third quarter GAAP earnings per diluted share from continuing operations of $0.67; (ii) reported Adjusted Earnings per diluted share from continuing operations of $1.45; and (iii) provided Adjusted Earnings per diluted share from continuing operations guidance for fiscal year 2014 of $8.05 to

30

$8.20. McKesson also reported gross profits of $1.8 billion on revenues of $34.3 billion, $29.3 billion of which came from its U.S. Pharmaceutical Distribution and Services business unit. The reported revenue represented a 10% increase over the same period in the prior fiscal year.

128.    On the same day, McKesson filed a Form 10-Q with the SEC reiterating the financial results previously announced in the Q3 2014 8-K and reporting its financial and operating results for the third quarter of its fiscal year ending in 2014.

129.    On May 12, 2014, McKesson filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the fourth quarter and fiscal year ending in 2014 (the "2014 8-K"). McKesson (i) reported GAAP earnings per diluted share from continuing operations of $1.56 for the quarter and $5.83 for the fiscal year; (ii) reported adjusted earnings per diluted share of $2.55 for the quarter and $8.35 for the fiscal year; and (iii) provided adjusted earnings per diluted share guidance for fiscal year ending in 2015 of $10.40 to $10.80 and also reported annual gross profit of $8.3 billion on revenues of $137.6 billion, $123.9 billion of which came from McKesson's NAPDS . The reported revenue represented a 13% increase over fiscal year 2013.

130.    On May 14, 2014, McKesson filed an Annual Report on Form 10-K with the SEC reiterating the financial results previously announced in the 2014 8-K and reporting its financial and operating results for the fourth quarter and full fiscal year ending in 2014.

131.    These statements, and others like them, were false and misleading for several reasons. First, McKesson's revenues and profitability were materially impacted by unsustainable generic drug price inflation, including price hikes that were the result of anticompetitive and collusive activities. Moreover, by May of 2014, at least 31 drugs are reported to have experienced price increases of more than 50% without any supply disruption, and at least another three drugs were found by the AGs to have been propped up by market allocation schemes. These 34 drugs are reported to have had annual sales of more than $4.7 billion.

SECOND AMENDED COMPLAINT

132.   Moreover, Defendant Hammergren's statements concerning McKesson's "magic" pricing formula were also false and misleading because instead of negotiating lower prices for customers, McKesson participated in price hikes and used its consumer purchase volume as leverage to collect higher discounts from generic drug manufacturers for itself.

133.   On July 31, 2014, McKesson filed a Current Report Form 8-K with the SEC announcing the Company's financial results for the first quarter of its fiscal year ending in 2015 (the "Q12015 8-K"). McKesson (i) reported first quarter GAAP earnings per diluted share from continuing operations of $1.78; (ii) reported adjusted earnings per diluted share from continuing operations of $2.49; and (iii) provided adjusted earnings per diluted share guidance for fiscal year ending in 2015 of $10.50 to $10.90 and also reported gross profits of $2.8 billion on revenues of $44.1 billion, $34.4 billion of which came from McKesson's NAPDS. The reported revenue represented a 37% increase over the same period in the prior fiscal year.

134.   On the same day, McKesson filed a Form 10-Q with the SEC reiterating the financial results previously announced in the Q1 2015 8-K and reporting its financial and operating results for the first quarter of its fiscal year ending in 2015 (the "Q1 2015 10-Q").

135.   On September 9, 2014, Defendant Beer participated in the Morgan Stanley Healthcare Conference and continued to mislead investors with the false narrative that the "supply disruption" caused the generic drug price inflation that was driving McKesson's financial rebound:

> Our experience continues to be that we are seeing these price increases where there is some sort of supply disruption occurring in the market for the molecule …. Where we do see a price increase occurring around a molecule, it can sometimes be quite high. So that is the situation that we are seeing play out around generic price inflation.

136.   Defendant Beer reiterated these claims at the Leerink Partners Services Roundtable (sponsored by Leerink SVB, an investment back specializing in the healthcare industry) on September 30, 2014:

> We continue to see the product inflation being driven by supply shortages of really a couple of flavors either where the FDA is taking some action around enforcement that is shutting down a line or a plant at a particular manufacturer. Or the other flavor really being where a manufacturer has for their own financial reasons, their own resource allocation priorities, elected to do likewise to shut down a plant, maybe a line, maybe reduce capacity on a line, some flavor of that sort of activity that reduces the overall supply of a drug from that one source providing opportunity for other sources to raise prices.

> *       *       *

> That said, sometimes the price increases that do occur can be quite large in percentage terms in a particular molecule. So we are continuing to see that play out as we have discussed in recent quarters.

137.   On October 28, 2014, McKesson filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the second quarter of its fiscal year ending in 2015 (the "Q2 2015 8-K"). McKesson (i) reported second quarter GAAP earnings per diluted share from continuing operations of $2.05; (ii) reported adjusted earnings per diluted share from continuing operations of $2.79; and (iii) provided adjusted earnings per diluted share guidance for fiscal year 2015 of $10.50 to $10.90 and also reported gross profits of $2.9 billion on revenues of $44.8 billion $35.1 billion of which came from McKesson's NAPDS. The reported revenue represented a 36% increase over the same period in the prior fiscal year.

138.   On the same day, McKesson filed a Form 10-Q with the SEC reiterating the financial results previously announced in the Q2 2015 8-K and reporting its financial and operating results for the second quarter of its fiscal year ending in 2015.

139.   On January 13, 2015, Defendants Hammergren and Beer participated in the J.P. Morgan Healthcare Conference where they made the following remarks.

> Hammergren: One of the highlights is our ability to help our customers do a better job in sourcing generics. . . . [T]he Health Mart independent pharmacy franchise which now numbers in excess of 3,500 stores where they also have provided us the responsibility for negotiating their product purchases as well as many other aspects of optimizing the performance of the Health Mart pharmacies.

> \*          \*          \*

> Beer: We very much feel as though we're right on track with the guide that we offered right at the start of the fiscal year for high single digit generic price inflation for drugs outside of the exclusivity period. And so we're very much continuing to see some sort of supply disruption at the root of these price increases, whether it's from a government related action, whether it's shutting down a line or a plant or backlog of approvals or whether it's a manufacturer taking a decision on their own to reallocate their capital. So, some sort of driver of supply disruption and as we see things today, we don't expect that to change.

140.   On February 5, 2015, McKesson filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the third quarter of its fiscal year ending in 2015 (the "Q3 2015 8-K"). McKesson (i) reported third quarter GAAP earnings per diluted share from continuing operations of $2.01; (ii) reported adjusted earnings per diluted share from continuing operations of $2.89; and (iii) provided increased fiscal year 2015 guidance for adjusted earnings per diluted share of $10.80 to $10.95 and also reported gross profits of $2.9 billion on revenues of $47 billion, $37.4 billion of which came from McKesson's NAPDS. The reported revenue represented a 37% increase over the same period in the prior

141.   On the same day, McKesson filed a Form 10-Q with the SEC reiterating the financial results previously announced in the Q3 2015 8-K and reporting its financial and operating results for the third quarter of its fiscal year 2015 (the "Q3 2015 10-Q").

142.   On March 3, 2015, Defendant Beer participated in the Cowen Health Care Conference. When asked how McKesson sees "the inflation environment currently, and what are sort of the puts and takes on how could that help investors think about what to expect going forward?" Beer answered:

> Certainly, when we started our fiscal year we indicated that we expected to see generic inflation in the high single-digit percentage growth rate levels year-over-year. So a little bit less than what we had seen in fiscal 2014, but well in advance in the higher levels than we had seen historically down through the years. And we are now into our fourth quarter of fiscal 2015, and we are generally seeing things track along pretty much as we had expected. We continue to see some sort of supply disruption at the heart of these increases in generic prices, whether it is a result of the FDA shutting down the line as a manufacturer, whether it's the FDA just being behind on applications, the new generics, or whether it's a manufacturer taking a decision to shift the way they invest their capital from one line, from one product, one molecule to another based on their own return-on-capital needs. So that's a set of points, really, that's been pretty consistent throughout this fiscal year for us. So no particular change from what we expected right at the start.

143.   On May 12, 2015, McKesson filed a Current Report on Form 8-K with the SEC reporting the Company's financial results for the fourth quarter and fiscal year ending in 2015 (the "2015 8-K"). McKesson (i) reported GAAP earnings per diluted share from continuing operations of $1.69 for the quarter and $7.54 for the fiscal year; (ii) reported adjusted earnings per diluted share of $2.94 for the quarter and $11.11 for the fiscal year; and (iii) provided adjusted earnings per diluted share guidance for fiscal year 2016 of $12.20 to $12.70 and also reported annual gross profit of $11.4 billion on revenues of $179 billion, $143.7 billion of which came from McKesson's NAPDS. The reported revenue represented a 30.3% increase over fiscal year 2014.

144.   On the same day, McKesson filed an Annual Report on Form 10-K with the SEC reiterating the financial results previously announced in the 2015 8-K and reporting its financial and operating results for the fourth quarter and full fiscal year 2015 (the "2015 10-K").

145.   During May 12, 2015 earnings call Hammergren and Beer again touted McKesson's profitable financial results without explaining to investors that McKesson's success was based on illegal price-fixing. Instead, Hammergren and Beer doubled down on the false and misleading narrative that McKesson's success was based, in part, on inflationary generic drug pricing, which they predicted would continue into the next fiscal year.

> Beer: For the full year, adjusted net income from continuing operations totaled $2.7 billion and our adjusted earnings per diluted share from continuing operations was $11.11. Overall, this year's adjusted earnings per share benefited significantly from our mix of business, specifically the favorable performance across our entire portfolio of generic pharmaceutical offerings and the contribution from our acquisition of Celesio.

> *     *     *

> As we look ahead to FY 16, we expect continued growth in segment-adjusted operating profit, driven by the contribution from our generic business …. In addition we … anticipate generic drug pricing trends slightly below those observed in FY15.

> Hammergren: I think we've seen a very robust cycle of generic inflation, at least we view it, and clearly we expect it to continue. We expect it to moderate slightly as we give our guidance for next year.

146.   On July 29, 2015, McKesson filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the second quarter of its fiscal year ending in 2015 (the "Q1 2016 8-K"). McKesson (i) reported GAAP earnings per diluted share from continuing operations of $2.50 for the quarter; (ii) reported adjusted earnings per diluted share of $3.14 for the quarter; and (iii) provided adjusted earnings per diluted share guidance for fiscal year 2016 of $12.36 to $12.86 and also reported gross profits of $2.8 billion on revenues of $47.5 billion, $40 billion of which came from McKesson's NAPDS. The reported revenue represented a 9% increase over the same period in the prior fiscal year.

SECOND AMENDED COMPLAINT

1    147.   On the same day, McKesson filed a Form 10-Q with the SEC reiterating the

2    financial results previously announced in the Q1 2016 8-K and reporting its financial and

3    operating results for the first quarter of its fiscal year 2016 (the "Q1 2016 10-Q").

4    148.   On October 28, 2015, McKesson filed a Current Report on Form 8-K with

5    the SEC announcing the Company's financial results for the second quarter of its fiscal

6    year 2015 (the "Q2 2016 8-K"). McKesson (i) reported second quarter GAAP earnings per

7    diluted share from continuing operations of $2.65; (ii) reported adjusted earnings per

8    diluted share from continuing operations of $3.31; and (iii) provided adjusted earnings per

9    diluted share guidance for fiscal year 2016 of $12.50 to $13.00 and also reported gross

10   profits of $2.9 billion on revenues of $48.8 billion $40.1 billion of which came from

11   McKesson's NAPDS. The reported revenue represented a 10% increase over the same

12   period in the prior fiscal year.

13   149.   On January 27, 2016, McKesson filed a Current Report on Form 8-K with

14   the SEC announcing the Company's financial results for the second quarter of its fiscal

15   year 2016 (the "Q3 2016 8-K"). McKesson (i) reported third quarter GAAP earnings per

16   diluted share from continuing operations of $2.71; (ii) reported adjusted earnings per

17   diluted share from continuing operations of $3.18; and (iii) provided adjusted earnings per

18   diluted share guidance for fiscal year 2016 of $12.60 to $12.90 and also reported gross

19   profits of $2.9 billion on revenues of $47.9 billion, $40 billion of which came from

20   McKesson's NAPDS. The reported revenue represented a 3% increase over the same

21   period in the prior fiscal year.

22   150.   On May 4, 2016, McKesson filed a Current Report on Form 8-K with the

23   SEC reporting the Company's financial results for the fourth quarter and fiscal year 2016

24   (the "Q4 2016 8-K"). McKesson (i) reported fourth quarter GAAP earnings per diluted

25   share from continuing operations of $1.97 for the quarter and $9.84 for the fiscal year;

26   (ii) reported adjusted earnings per diluted share from continuing operations of $2.44 for

27   the quarter and 12.08 for the fiscal year; and (iii) provided adjusted earnings per diluted

28   share guidance for fiscal year 2017 of $13.30 to $13.80.McKesson also reported annual

37

SECOND AMENDED COMPLAINT

1  gross profits of $11.4 billion on revenues of $190.9 billion, $159 billion of which came

2  from McKesson's NAPDS. The reported revenue represented a 7% increase over the same

3  period in the prior fiscal year.

4      151.   From 2014 on, all of the above-referenced SEC filings contained signed

5  certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants

6  Hammergren and/or Beer, attesting to the accuracy of financial reporting, the disclosure of

7  any material changes to the Company's internal control over financial reporting, and the

8  disclosure of fraud (or lack thereof).

9      152.   Defendants' statements that the generic drug market "remains competitive"

10  and that generic drug price inflation was driven by "small group of generic drugs" or

11  "supply disruption" were materially false and misleading when made because the price

12  hikes driving McKesson's financial results, including NorthStar's collusive price hikes,

13  were implemented on drugs for which no supply disruption had in fact occurred. As

14  described in the AG Complaint and elsewhere, dozens of price hikes were the result of

15  collusive behavior. By May 2016, at least 79 drugs had experienced price increases of more

16  than 50% without any supply disruption, and at least another four drugs were found by the

17  AGs to have been propped up by market allocation schemes. These 83 drugs had annual

18  sales of more $14.8 billion.

19      153.   Throughout the relevant period, Hammergren and Beer repeatedly made

20  statements concerning McKesson's ability to help customers reduce costs and improve

21  performance and McKesson being "extremely disciplined and diligent" to ensure its

22  customers were "benefiting through our action in the supply chain," helping "customers

23  buy at a competitive rate," passing through "the benefits of" drug prices to its customers,

24  and attaining "competitive price in the marketplace." These statements were materially

25  false and misleading when made because, instead of negotiating lower prices for its

26  customers, McKesson: (i) colluded in relation to the price hikes instituted by the

27  manufacturers; and (ii) used its aggregated customer purchase volume as leverage to collect

28  higher discounts from generic drug manufacturers for itself.

154.    Defendants' statements above concerning NorthStar having many competitors in the market and about its growth and success were materially false and misleading when made because: (i) NorthStar was in collusive relationships with generics manufacturers to hike prices for generic drugs; and (ii) NorthStar's profitability was driven by anticompetitive activities.

155.    Defendants' statements above concerning McKesson's revenues and profitability were materially false and misleading when made because McKesson's financial results were materially impacted by unsustainable generic drug price hikes, including price increases driven by collusive activities.

### F.  The Truth Comes Out

156.    As a result of Defendants' false and misleading statements, the Company's stock price artificially doubled between 2013 and the end of 2016.

157.    However, by 2016, the DOJ's investigation into the collusive pricing scheme had begun to have an effect on the generic drug industry. As the result of continued government scrutiny, increases to generic drug price subsided causing McKesson's financial results to tumble:



SECOND AMENDED COMPLAINT

1

2      158.   During its October 25, 2016 meeting, the Board received a "Financial Review

3 of McKesson's Second Quarter Earnings and FY2017 Outlook" in which the Company

4 revealed that "[Year-over-Year] operating profit declined 19% as benefits from

5 procurement synergies and Specialty growth were offset by headwinds in both generic and

6 branded profitability at [McKesson's U.S. pharmaceutical operations]."

7      159.   On the October 27, 2016 earnings call, Defendant Hammergren acted shocked

8 by the new competitiveness in the United States pharmaceutical market place:

> Generally speaking we anticipate pockets of increased
> competitive activity as part of our normal course of business.
> What we began to see more recently is competitive activity that
> is broader than our original expectations, more aggressive, and
> across several areas of our U.S. pharmaceutical business.

*     *     *

> When a competitor significantly undercuts our existing pricing,
> we are compelled to respond. And although we cannot be
> absolutely assured that recent price concessions will address the
> recent heightened competitiveness fully, we believe our
> responses have been appropriate and measured.

160.   On the same call, Defendant Beer responded to a question about price

inflation by reporting that "the decline we have seen in the inflation rate is greater than a

third of the original expectation for the year. So it's a significant decline."

161.   Noticeably missing from McKesson's statements is any reference to the

"supply disruptions" that had been supposedly driving inflation for the past several years.

162.   On October 27, 2016, after the market closed, McKesson announced in its

2Q17 Form 8-K that the "[s]econd-quarter results were impacted by a softer pricing

environment in our U.S. Pharmaceutical business within Distribution Solutions," with

"gross profit and gross profit margin for the second quarter and first six months of 2017

decreased compared to the same periods a year ago due to weaker pharmaceutical pricing

trends" and competitive pricing environment from the U.S. distribution business. The Form

8-K further stated that "[t]he company is updating its outlook from the previous range of $13.42 to $13.93 per diluted share to a new range of $12.35 to $12.85 per diluted share for the fiscal year ending March 31, 2017."

163.    On the same day, Beer announced during an earnings call that McKesson's adjusted gross profit for the second quarter was down 6% driven in part by "expected weaker profit contribution from generic inflation trends" and "increased competitive customer pricing activity." As a result, EPS would be materially lower by $1.60 to $1.90 per share due primarily to pricing issues in the generic drug business. The next day, *McKesson's stock prices declined 22.67%*. The market was clearly surprised by this information, and was not fully apprised of the improper conduct that had been occurring at McKesson behind the scenes.

164.    On November 3, 2016, Bloomberg reported that the DOJ investigation into the suspected drug price collusion was "bearing down on generic pharmaceutical companies." This news was widely reported, and caused the price of McKesson stock to tumble another 4.59%.

165.    During McKesson's 3Q 2017 earnings call during the evening of January 25, 2017, Beer announced that "Distribution Solutions' adjusted gross profit, excluding unusual items, was down 8% on a constant currency basis for the quarter," driven in part by "expected weaker profit contribution from generic manufacturer inflation trends" and "increased competitive customer pricing activity." As a result of this news, the price of McKesson stock collapsed another $12.55 from a closing price of 151.10 per share on January 25, 2017 to $138.55 per share on January 26, 2017, or 8.3%. In total, McKesson's stock price fell 42% from a high of over $240 per share to $138.55 per share.

166.    McKesson continued to feel the effects from the collapse of the price-fixing and market allocation scheme evidenced by the fact that "generic pricing pressure" was a topic of discussion at McKesson's January 2017 Board Meeting.

167.    By May 22, 2017, McKesson was warning its Board of Directors that the pricing of generic drugs had settled at "low single digit **deflation**" and that under public

and governmental pressure, drug manufacturers were pledging to limit price increases to under 10% annually. McKesson also reported that "aggressive price competition" resulted in the "re-pricing of Generics among all three main distributors."

## VII.   DEFENDANTS' FIDUCIARY AND OVERSIGHT DUTIES

168.   Delaware law imposes the traditional fiduciary duties of care, loyalty, good faith, and disclosure upon all directors and officers; these duties are owed to a corporation and to the corporation's shareholders. Under Delaware law, it is the duty and responsibility of a company's board of directors to manage the business of a Delaware corporation, and, accordingly, McKesson's directors and officers are entrusted with management responsibility and must protect the interests of the corporation and its shareholders.

169.   Pursuant to McKesson's publicly available Corporate Governance Guidelines, the McKesson board of directors is tasked with directing and overseeing the business and affairs of the company. The board of directors "is also responsible for assuring that the Company's management and employees operate in a legal and ethically responsible manner." To that end, board members are purportedly selected on the basis of their "professional and personal ethics, integrity, values," as well as their experience at the "policy-making level in business, technology, healthcare, or public interest."

170.   Furthermore, McKesson's Corporate Governance Guidelines state that all members of the McKesson board "have a fiduciary responsibility to represent the best interest of the Company and all of its stockholders" rather than their personal interests or to their personal benefits.

171.   By virtue of their positions as officers and directors of McKesson, and because of their ability to control the business and corporate affairs of McKesson, Defendants owe McKesson and its stockholders fiduciary obligations of good faith, loyalty, and candor, and they are required to do their utmost to control and manage McKesson in a fair, just, honest, and equitable manner. Each director and officer of the Company owes to McKesson and its stockholders the fiduciary duty to exercise good faith and diligence in

1  the administration of the affairs of the Company and in the use and preservation of its
2  property and assets.

3      172.  McKesson publicly represents in its Corporate Governance Guidelines that
4  each board member is provided with the necessary information to familiarize himself or
5  herself with "the Company's business, strategic plans, significant financial, accounting and
6  risk management issues, compliance programs, conflicts policies, code of business conduct
7  and ethics, corporate governance guidelines, principal officers, internal auditor(s) and
8  independent auditors."

9      173.  Because of their advisory, executive, managerial and directorial positions
10  within McKesson, each of the Defendants had knowledge of material, nonpublic
11  information regarding the Company.

12      174.  The McKesson Audit Committee owes several additional duties to
13  McKesson. Pursuant to McKesson's publicly available Audit Committee Charter, the
14  Audit Committee shall: "review and discuss with management and independent auditors
15  the annual audited financial statements and the disclosures therein," "discuss with
16  management the Company's earnings press releases, including the use of 'pro forma' or
17  'adjusted' non-GAAP information, as well as financial information and the type and
18  presentation of information to be presented in earnings guidance provided to analysts and
19  rating agencies," "engage in ongoing discussions with management about the Company's
20  major risk exposures and the process and system which management uses to monitor and
21  control such exposures," "review disclosures made to the [Audit] Committee by the
22  Company's CEO and CFO during their certification process for the Company's Form 10-
23  K and Form 10-Q," "obtain from the independent auditors assurance that Section 10A(b)
24  of the Exchange Act [relating to illegal acts that may come to the attention of auditors] has
25  not been implicated," and "discuss with the Company's General Counsel legal matters that
26  may have a material impact on the Company's financial statements."

27      175.  The Defendants were also governed by McKesson's "Code of Conduct,"
28  which was published on the Company's website and referenced the Company's SEC filings

43

(for example in McKesson's 2015 and 2016 10-Ks). At all times relevant to this Complaint, McKesson's Code of Conduct provided that "[t]his Code applies globally to all employees, officers, and Directors – regardless of position or tenure. We also seek business partners who share our values and commitment to doing business with integrity." Unfortunately, this was just a paper promise.

176.    Despite McKesson's participation in a vast antitrust/anti-competitive scheme, McKesson publicly professed its devotion to "Fair Competition" in its "Code of Conduct." That section of the document provided that: "We value a marketplace in which our company competes to sell superior services and quality products at fair prices. Laws in many of the places where we do business are intended to protect fair an open competition. To comply with these laws you should not discuss, coordinate, or agree with a competitor to fix prices, divide sales opportunities or territories, split or 'fix' bids, refuse to deal with (or boycott) a supplier or customer, or otherwise limit distribution channels in an illegal manner."

177.    Moreover, at all relevant times, the Defendants were aware that McKesson operates in a tightly regulated and highly scrutinized environment, which virtually guaranteed that the Company's anticompetitive scheme would be uncovered.

178.    Thus, the oversight of McKesson's involvement in the illegal price-fixing and market allocation scheme fell squarely within the direct oversight responsibilities of the McKesson board of directors and its Audit Committee.

## VIII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

179.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

180.    Plaintiff brings this action derivatively on behalf of McKesson to redress injuries already suffered and injuries that continue to be suffered as a direct and proximate result of the misconduct alleged herein. McKesson is named as a nominal Defendant solely in a derivative capacity.

SECOND AMENDED COMPLAINT

181.   Plaintiff will fairly and adequately represent the interests of the Company in enforcing and prosecuting its rights.

182.   Plaintiff has made a substantial investment in McKesson. She has owned her shares continuously throughout the period in which Defendants' wrongful acts occurred, and she continues to own her shares, thus giving her standing to pursue this action.

183.   This action is not being used by Plaintiff to gain any personal advantage, nor does Plaintiff maintain any personal agenda other than seeking to remedy the wrong that has been done. To this end, Plaintiff has taken steps to file this action and has retained counsel experienced in derivative litigation and corporate governance actions.

184.   Plaintiff did not make a demand on the board of directors to take remedial action on behalf of McKesson against its own members because such a demand would have been a futile, wasteful and useless act.

185.   The current board of directors of McKesson includes Defendants Coles, Knauss, Knowles, Jacobs, Mueller, Tyler, and Salka, as well as four additional members appointed after the events of this complaint took place—Dominic Caruso, Bradley Lerman, Maria Martinez, and Kenneth Washington. A majority of the current Board lacks the necessary independence and disinterest to reasonably or in good faith evaluate a demand to bring the action set forth herein.  Accordingly, Plaintiff is excused from making a pre-suit demand.

186. Defendant Tyler is the current CEO of McKesson. He was appointed to that position by the board—in other words, by his co-Defendants. Prior to his appointment as CEO, he was COO of McKesson.

187. From 2015 to 2018, Tyler headed McKesson's North American business, which itself was the beneficiary of the generic drug price-fixing conspiracy as alleged herein. As the chief executive of McKesson's North American business, Tyler certainly had the benefit of access to, and insight from, McKesson's "huge data analytics machine" regarding the generic drug pricing market.

188. Prior to his service as head of North America, Tyler was a senior financing and acquisitions executive at McKesson for three years. Indeed, Tyler has worked at McKesson for more than 20 years—almost the entirety of his professional career.

189. During all of his stints as a senior executive of McKesson, Tyler's compensation was set by his co-Defendants who sat on the Compensation Committee of the board at the time. His compensation is now set by that same Committee and approved by his fellow board members. Tyler depends entirely for his continued employment and compensation—salary and awards of stock totaling millions of dollars—on the other members of the board, including many of his co-Defendants.

190. All of these factors render Tyler interested and lacking in impartiality for the purposes of demand futility.

191. Even McKesson's own filings with the SEC, such as its 2019 Schedule 14(A) proxy statement, concede that Tyler is not "independent" under New York Stock Exchange rules or McKesson's own "Corporate Governance Guidelines."

192. Defendants Coles, Knauss, Knowles, Jacobs, Mueller, and Salka have all sat on the McKesson board since at least 2014 if not earlier. Thus, they were members of the board throughout the time that Defendants Hammergren and Beer made misleading statements to the public on behalf of McKesson regarding generic drug prices and their effect on the Company's profitability.

193. That the Company and Defendants Hammergren and Beer were aware of McKesson's benefit from a generic drug price-fixing conspiracy is clear. As this Court stated: "Hammergren and Beer touted intimate knowledge of generic drug manufacturers, generic drug pricing, and challenges that might impede supply. They went on to falsely attribute generic drug price increases to non-existent supply disruptions. If Hammergren and Beer really had the intimate knowledge of generic drug pricing and conditions in the generic drug market that they claimed, it was at least deliberately reckless not to investigate the accuracy of their statements that price increases were being driven by specific, legitimate supply disruptions, rather than collusive activity. For the same reason, these

46

statements are sufficient allegations that it was at least deliberately reckless for McKesson to ignore the falsity of its claims that the generic drug market remained competitive." *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019).

194. It is reasonable to infer that the knowledge of the underlying generic drug price-fixing conspiracy, as well as the falsity of Hammergren's and Beer's statements regarding "supply disruptions," the competitiveness of the generic drug market, and the reasons for the part played by the generic drug market in contributing to McKesson's financial performance, that McKesson, Hammergren and Beer had in 2014, 2015, 2016 and beyond, was knowledge that Defendants Coles, Knauss, Knowles, Jacobs, Mueller, and Salka had over that same period of time.

195. The documents produced by McKesson in response to the Demand show that generic drug pricing and its effects on McKesson's bottom line were a regular part of the discussions among the McKesson board of directors in 2017 and 2018. Defendant Hammergren was a member of the board and Defendant Beer was a frequent attendee of board meetings; both participated in discussions during these board meetings regarding issues like "branded and generic pricing pressure" and the "competitive landscape" and their effect on McKesson's financial performance. It is reasonable to infer that these discussions conveyed the information Hammergren and Beer gained from McKesson's "huge data analytics machine" and "intimate" knowledge of the generic drug market in light of the comprehensiveness of the discussions and the efforts of the board members to comply with their legal and corporate duties to oversee the Company's business, particularly a part of the business that constituted such a large portion of McKesson's profits.

196. It is also reasonable to infer that similar discussions took place at board meetings involving Hammergren and Beer in 2014, 2015 and 2016, because there is nothing in any of McKesson's public filings or various board charter documents to indicate that the content of these meetings changed in any material fashion during this time, nor is

there anything to indicate that the corporate and legal obligations of McKesson's directors—as they would have understood them—changed materially during this time, either.

197. Assuming that Defendants Coles, Knauss, Knowles, Jacobs, Mueller, and Salka were paying attention to the financial information and "huge data analytics machine" regarding the generic drug market during these years that Defendants Hammergren and Beer likely shared with them during this time, they knew or were reckless or grossly negligent in not knowing that Hammergren and Beer's statements to the public about supply disruptions and the competitiveness of the generic drug market were false.

198. They also knew or were reckless or grossly negligent in not knowing that the SEC filings made by the Company during this time, which failed to acknowledge the falsity of these statements and instead provided incomplete and misleading explanations for the generic drug market's effect on McKesson's financial performance, were therefore rendered false and misleading. From at least 2013 through the present day, Defendant Knowles has sat on the Audit Committee and was therefore intimately involved in vetting the Company's securities filings and ensuring their continued accuracy. Defendants Knauss and Salka joined the Audit Committee in 2015, with the former remaining on it to the present day, while the latter remained on it through 2018. Defendant Jacobs joined the Audit Committee in 2019. Former director Defendants Bryant and Budd served on the Audit Committee in 2013 and 2014; Defendant Irby also served in 2014. As discussed above, these directors' service on the Audit Committee should have made them acutely aware of the misleading omissions and misrepresentations in McKesson's securities filings, information that they would have shared with the rest of the board during the Audit Committee's regular reporting to the full board.

199. But regardless of whether they served on the Audit Committee, all of these directors should have known that Hammergren and Beer's public statements were patently false, because they knew or were reckless or grossly negligent in not knowing, based on their exposure to the intimate knowledge of McKesson's senior executives regarding the

1  generic drug market, that McKesson was at the very least benefiting from a generic drug

2  market antitrust conspiracy.

3      200. Defendants Coles, Knauss, Knowles, Jacobs, Mueller, and Salka had every

4  reason to be aware of the financial benefit McKesson was deriving from price-fixing in the

5  generic drug market, and every reason to be aware of the fact that the attribution by

6  Defendants Hammergren and Beer, as well as by the Company generally, of that benefit to

7  other causes was false.

8      201. Defendants Coles, Knauss, Knowles, Jacobs, Mueller, and Salka are accused

9  of failing to respond to numerous red flags regarding a wide-ranging price-fixing scheme

10  that had a tremendous impact on McKesson's business during their tenure on the board of

11  directors. This included a wide-ranging criminal conspiracy, where McKesson was

12  "strategically aligned" with one of the conspirators.

13      202.   During the time period when Defendants Coles, Knauss, Knowles, Jacobs,

14  Mueller, and Salka worked on the board of directors, the Insider Trading Defendants—

15  including Defendants Jacobs and Knowles, who still serve on the board of directors—

16  engaged in a massive insider trading campaign, with Defendant Jacobs selling more than

17  $670,000 of McKesson stock between 2014 and 2016 and Defendant Knowles selling over

18  $505,000 of McKesson stock between 2014 and 2016 at artificially inflated prices.

19      203.   The price-fixing scheme that has been uncovered by the DOJ and the AGs

20  goes to the core operations of McKesson's business, as well as that of McKesson's

21  subsidiary NorthStar. McKesson officials bragged about their such that the Defendants

22  either knew or should have known about the illegal scheme.

23      204.   The price-fixing scheme that has been uncovered by the DOJ and the AGs

24  was also widely publicized in the press, such that the officers and directors of McKesson

25  should have been adequately alerted that the illegal scheme could not continue in

26  perpetuity.

27      205.   Despite a books and records request, which covers the time period when the

28  AG Complaint was filed, there is no evidence that anyone on the board of directors—or

49

anyone at all at McKesson—ever questioned the insider trading or the collusive activity that took place at McKesson. That is a stunning omission; if these directors believed McKesson to be an innocent beneficiary of a heretofore-unknown-to-them conspiracy, then the board meeting minutes following the AG Complaint should reflect their concern about its implications, particularly its implication that McKesson was an unnamed co-conspirator. Yet the meeting minutes reflect no such discussion. There is no effort by the board to distance the Company from the conspiracy or its participants, suggesting at the very least either the board's prior knowledge of passive benefiting or active participation in the generic drug market conspiracy.

206. Therefore, given that a majority of the current board of directors affirmatively failed to fulfill its most basic fiduciary duties, and is far too directly and specifically involved in the misconduct alleged herein to be able to reasonably or in good faith evaluate a demand to investigate their own misconduct, a pre-suit demand on the board of directors would futile and Plaintiff is excused from making such a demand.

## COUNT 1
## BREACH OF FIDUCIARY DUTY
### (AGAINST ALL DEFENDANTS)

207. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

208. The Defendants, by reason of their positions as officers and Directors of McKesson and because of their ability to control the business and corporate affairs of McKesson, owed McKesson fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage McKesson in a fair, just, honest, and equitable manner.

209. Each of the Defendants violated their fiduciary duties by consciously failing to prevent the Company from engaging in the unlawful acts complained of herein. The Defendants repeatedly encouraged and/or acquiesced in unlawful and unethical behavior throughout the Company's business operations.

210.    The Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity alleged herein. The Defendants either knew, were reckless, or were grossly negligent in not knowing that McKesson was implicated in an illegal price-fixing and market allocation scheme. The Defendants' misconduct was not due to an honest error in judgment, but rather their bad faith and was done knowingly, willfully, intentionally or recklessly.

211. In the alternative, Defendants either knew, were reckless, or were grossly negligent in not knowing that McKesson was benefiting from the illegal price-fixing and market allocation scheme, and that McKesson senior executives were falsely representing to the public (1) that certain price fluctuations were caused by "supply disruptions" rather than the scheme, (2) that the generic drug market was competitive and not affected by the scheme, and (3) that McKesson's financial performance was not attributable in part to its benefiting from the scheme.

212.    Defendants also breached their fiduciary duty by failing to ensure that the SEC statements described herein, which they knew or were reckless in not knowing contained improper statements and omissions regarding the above misrepresentations, were corrected.

213.    Accordingly, the Defendants breached their fiduciary duties to the Company.

214.    As a direct and proximate result of the Defendants' breaches of their fiduciary obligations, McKesson has sustained significant damages, as alleged herein, including without limitation, the precipitous decline in McKesson's artificially inflated value following the public disclosure of the wrongful acts complained of herein as well as the exposure of the Company to significant legal liability for those same wrongful acts.

215.    Plaintiff, on behalf of McKesson, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment on behalf of McKesson against the Defendants, jointly and severally, as set forth herein, as follows:

1    (i)      Declaring that this action is a proper derivative action;

2    (ii)     Ordering each of the Defendants to pay restitution and/or compensatory

3    damages in favor of McKesson, plus prejudgment interest;

4    (iii)    Ordering that Defendants return all management fees, advisory fees,

5    expenses and other fees paid by McKesson during the period that they breached

6    their fiduciary duties;

7    (iv)     Ordering Defendants who engaged in insider trading to disgorge all profits

8    made by such insider trading to McKesson;

9    (iv)     Awarding Plaintiff costs and disbursements and reasonable allowances for

10   fees of Plaintiff's counsel and experts and reimbursement of expenses; and

11    (v)     Granting such other and further relief as the Court may deem just and proper.

12                              **JURY DEMAND**

13   Plaintiff demands a trial by jury.

14

15   DATED: February 20, 2020                        Respectfully submitted,

16
                                                     */s/ Christopher D. Sullivan*
17                                                   Christopher D. Sullivan
18                                                   Diamond McCarthy LLP
                                                     150 California Street, Suite 2200
19                                                   San Francisco, California 94111
                                                     Telephone: (415) 692-5201
20                                                   E-Mail: csullivan@diamondmccarthy.com
21

22                                                   Samuel E. Bonderoff
23                                                   **ZAMANSKY LLC**
24                                                   50 Broadway, 32nd Floor
                                                     New York, NY 10004
25                                                   Phone: (212) 742-1414
                                                     Email: samuel@zamansky.com
26

27

28

SECOND AMENDED COMPLAINT