IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JEAN E. HENRY,

                Plaintiff,

        v.

BRIAN J. TYLER, et al.,

                Defendants.

Case No.  19-cv-02869-CRB

**ORDER DISMISSING ACTION WITH PREJUDICE**

Jean Henry's third complaint in this derivative shareholder action once again alleges that former and current McKesson Corp. executives and directors (collectively, "Defendants") breached their fiduciary duties.  And once again, Henry fails to sufficiently allege either demand futility or that McKesson participated in a price-fixing conspiracy.  Because her previous complaint suffered the same deficiencies, and this is Henry's third attempt to plausibly allege her claims, the Second Amended Complaint is dismissed with prejudice.

## I.    BACKGROUND

McKesson is a pharmaceutical wholesaler.  SAC (dkt. 58) ¶ 21.  The majority of its business involves sourcing generic drugs to sell to pharmacies and hospitals.  Id.  McKesson also owns a subsidiary, NorthStar Rx ("NorthStar"), that manufactures generic drugs.  Id. ¶ 22.

In the last several years, evidence has come to light of widespread anti-competitive conduct in the generic drug market.  Id. ¶ 2.  Investigations by Congress, the Department of Justice, and forty-seven state Attorneys General have led to multiple guilty pleas and complaints alleging a wide-ranging price-fixing conspiracy.  Id. ¶ 1–3, 60–71.  McKesson has not been charged in any government action related to the antitrust conspiracy, id. ¶ 9, but it is a defendant in

various civil actions arising from the scandal, including a securities fraud class action pending before this Court, id. ¶ 1.

Henry is a shareholder in McKesson. Id. ¶ 182. She is bringing this action derivatively on behalf of McKesson, alleging that Defendants breached their fiduciary duties of loyalty and care. Id. ¶¶ 180, 209. The SAC alleges that Defendants knowingly, recklessly, or negligently allowed McKesson to become "implicated in an illegal price-fixing and market allocation scheme." Id. ¶ 210. McKesson ostensibly participated in the antitrust conspiracy both as a wholesaler and through NorthStar. Id. ¶¶ 72–97. The SAC seizes on allegations from a separate action that generic drug manufacturers Heritage Pharmaceuticals, Inc. and Mayne Pharma Inc. conspired to divide the market for Doxy DR. Id. ¶¶ 79–80. Because Heritage and Mayne supplied Doxy DR to McKesson, and a Heritage employee stated that McKesson and Heritage were "strategically aligned," the SAC suggests McKesson must have been in on the agreement. Id. ¶ 79. It also reiterates allegations from the securities class action that NorthStar colluded to fix the price of Leflunomide. Id. ¶¶ 91–92. The SAC also alleges circumstantial evidence of McKesson's participation in a price-fixing conspiracy. Id. ¶¶ 83–84, 95–97.

Henry's second theory of liability is that Defendants exposed McKesson to "substantial liability" in the securities fraud class action by making false and misleading statements about the company's income and the underlying causes of generic drug price inflation. Id. ¶¶ 121–67. Many of the alleged falsehoods are explanations McKesson's former Chief Executive Officer John Hammergren and former Chief Financial Officer James Beer offered for rising generic drug prices. See, e.g., id. ¶ 122. Henry also alleges that financial statements filed with the Securities and Exchange Commission were misleading because "McKesson's financial results were materially impacted by unsustainable generic drug price hikes, including price increases driven by collusive activities." Id. ¶ 155.

According to the SAC, McKesson's Audit Committee was responsible for reviewing, or at least discussing, "annual audited financial statements and the disclosures therein," "earnings press releases," and "financial information and the type and presentation of information to be presented in earnings guidance." Id. ¶ 174. Defendants Andy Bryant, Wayne Budd, Alton Irby III, M.

United States District Court
Northern District of California

1  Christine Jacobs, Donald Knauss, Marie Knowles, and Susan Salka were or are members of the

2  Audit Committee.  Id. ¶¶ 27–33.

3      McKesson's current Board of Directors ("the Board") is comprised of defendants N.

4  Anthony Coles, Knauss, Knowles, Jacobs, Edward Mueller, Brian Tyler, and Susan Salka, plus

5  non-defendants Dominic Caruso, Bradley Lerman, Maria Martinez, and Kenneth Washington.  Id.

6  ¶ 185.  Henry alleges she "did not make a demand on the board of directors to take remedial action

7  on behalf of McKesson," as usually required to bring a derivative action, "because such a demand

8  would have been a futile, wasteful and useless act."  Id. ¶ 184; see also Rosenbloom v. Pyott, 765

9  F.3d 1137, 1148 (9th Cir. 2014).

10     After Defendants moved to dismiss for failure to state a claim, Henry filed an amended

11 complaint.  see generally First MTD (dkt. 38); FAC (dkt. 41).  Defendants then filed a second

12 motion to dismiss, arguing that Henry has failed to adequately plead either a plausible claim for

13 breach of fiduciary duty or demand futility.  See generally Second MTD (dkt. 44).  This Court

14 granted the motion, holding that Henry had failed to adequately allege the antitrust violations

15 underlying her first theory of liability or demand futility as to her second theory.  See generally

16 Order (dkt. 55).  Dismissal was without prejudice.  Id. at 9.

17     Henry then filed the SAC.  The SAC's substantive allegations are basically identical to the

18 FAC's, see generally SAC Redline (dkt. 58-2), with the exception of some additional details as to

19 why the Board is not disinterested or independent, see SAC ¶¶ 186–200.  Those allegations focus

20 on Tyler's role as McKesson's CEO and discussions the Board had in 2017 and 2018.  See id.

21 Defendants have moved to dismiss the SAC.[1]  Mot. (dkt. 61).

22 **II.    LEGAL STANDARD**

23     Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for failure

[1] Defendants have also requested judicial notice of McKesson's Certificate of Incorporation, RJN in Support of Mot. (dkt. 62), and 2018 Proxy Statement, RJN in Support of Reply (dkt. 68).  Both requests are granted.  See Metzler Inv. GMBH v. Corinthian Coll. Inc., 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (SEC filings are properly subject to judicial notice); In re Facebook, Inc. S'holder Deriv. Privacy Litig., 367 F. Supp. 3d 1108, 1118 (N.D. Cal. 2019) (certificates of incorporation properly subject to judicial notice).

3

United States District Court
Northern District of California

to state a claim upon which relief may be granted.  Dismissal may be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 697 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678.  When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

If a court does dismiss a complaint for failure to state a claim, it should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).  A court nevertheless has discretion to "deny leave to amend due to 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment.'" Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

"The derivative form of action permits an individual shareholder to bring suit to enforce a corporate cause of action against officers, directors, and third parties." Rosenbloom, 765 F.3d at 1147 (quoting Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95 (1991)).  "A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile." Id. at 1148 (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 989 (9th Cir. 1999)).  "The purpose of this demand requirement in a derivative suit is to implement the basic principle of corporate governance that the decisions of a corporation—

4

1   including the decision to initiate litigation—should be made by the board of directors or the

2   majority of shareholders." Id. (quoting In re Pfizer Inc. S'holder Derivative Litig., 722 F. Supp.

3   2d 453, 458 (S.D.N.Y. 2010)).

4        A derivative action plaintiff who fails to make a demand must "state with particularity the

5   reasons for . . . not making the effort." Fed. R. Civ. P. 23.1(b)(3)(B). "[T]he substantive law

6   which determines whether demand is, in fact, futile is provided by the state of incorporation of the

7   entity on whose behalf the plaintiff is seeking relief." Rosenbloom, 765 F.3d at 1148 (citation

8   omitted). McKesson is a Delaware corporation, so Delaware law applies. FAC ¶ 20; see also id.

9        Delaware law requires a shareholder bringing a derivative suit to "demonstrate[ ], with

10  particularity, the reasons why pre-suit demand would be futile." Rosenbloom, 765 F.3d at 1148

11  (internal citation omitted). Futility is determined on a director-by-director basis. "[A] derivative

12  complaint must plead facts specific to each director, demonstrating that at least half of them could

13  not have exercised disinterested business judgment in responding to a demand." Desimone v.

14  Barrows, 924 A.2d 908, 943 (Del. Ch. 2007). The relevant board is the one sitting when the

15  complaint is filed. Rosenbloom, 765 F.3d at 1148. "Plaintiffs are entitled to all reasonable factual

16  inferences that logically flow from the particularized facts alleged, but conclusory allegations are

17  not considered as expressly pleaded facts or factual inferences." Id. (quoting Brehm v. Eisner, 746

18  A.2d 244, 255 (Del. 2000)).

19       "When a shareholder challenges a decision of a board of directors, Delaware law provides

20  a two-part, disjunctive test for demand futility." Id. at 1149. A shareholder can demonstrate

21  futility by creating a reasonable doubt either that "the directors are disinterested and independent"

22  or "that the challenged transaction was otherwise the product of a valid exercise of business

23  judgment." Id. (quoting Brehm, 746 A.2d at 256).

24       On the other hand, when the shareholder alleges "that demand is excused on the ground

25  that a board remained consciously inactive when it knew (or should have known) about illegal

26  conduct," the complaint must "allege 'particularized facts establishing a reason to doubt that the

27  board of directors could have properly exercised its independent and disinterested business

28  judgment in responding to a demand.'" Id. at 1150 (quoting Wood v. Baum, 953 A.2d 136, 140

United States District Court
Northern District of California

(Del. 2008)).  "Under either approach, demand is excused if . . . particularized allegations create a reasonable doubt as to whether a majority of the board of directors faces a substantial likelihood of personal liability for breaching the duty of loyalty."  Id.

### III.    DISCUSSION

Henry once again advances two theories of liability, one based on McKesson's ostensible participation in or benefit from an illegal price-fixing conspiracy, and the other on false statements made by McKesson's officers and in its financial statements.  See SAC ¶¶ 210–12.  She also once again fails to adequately plead either theory, for the same reasons identified in this Court's previous order.

### A.    Antitrust Violations

This Court previously concluded that "[a]ny theory of liability premised on McKesson's participation in a price-fixing conspiracy fails because the FAC fails to plausibly allege the underlying antitrust violations."  Order at 6.  The SAC's price-fixing allegations are substantively identical to the FAC's, so the antitrust theory of liability fails for the same reason it did before.[2] See SAC Redline ¶¶ 41–120.

Indeed, Henry does not contend that the SAC contains new or amended allegations that could lead this Court to reach a different conclusion on this issue.  See Opp'n (dkt. 66) at 19. Instead, she advances a new argument: that it is unnecessary to show that McKesson itself participated in the price-fixing agreements to hold its directors liable for the antitrust conspiracy. Id. at 19–20.  According to Henry, "illegal conduct does not necessarily have to be committed by the board of directors itself, or even by the Company itself, as long as a Plaintiff can demonstrate plausible allegations that there was a 'business plan premised on illegal conduct.'"  Id. at 19 (quoting Rosenbloom, 765 F.3d at 1157–58).  Therefore, even if McKesson itself did not

---

[2]  Henry adds a single new allegation to support her antitrust theory of liability, that "Tyler has . . . recently engaged in a patter of insider selling."  SAC ¶ 120.  Because this alleged insider selling occurred in 2019 and 2020, id., after the price-fixing scandal came to light, id. ¶ 3, and to some extent after the instant lawsuit was filed, see Complaint (dkt. 1-1), it would be nonsensical to argue that this allegation supports Henry's claim that McKesson participated in anticompetitive agreements.

United States District Court
Northern District of California

1    participate in the antitrust conspiracy, if its directors were aware of that conspiracy, and profited

2    from it by selling generic drugs at the inflated prices facilitated by other entity's unlawful

3    agreements, they could be liable for breaching their fiduciary duties.[3]  Id. at 19–20.

4         This theory relies on a single quotation from Rosenbloom v. Pyott, that it is a breach of

5    fiduciary duty to "knowingly adopt[ ] a business plan premised on illegal" conduct.  765 F.3d at

6    1158; see also Opp'n at 19–20.  But Henry takes that quote out of context.  In Rosenbloom, the

7    board of directors was alleged to have adopted a business plan premised on their own company's

8    illegal conduct; to wit, "illegal off-label marketing of Botox."  765 F.3d at 1158.  Rosenbloom

9    does not stand for the much broader rule Henry advocates, that a corporate director breaches his or

10   her fiduciary duty by authorizing a business plan that profits from illegal conduct, even if the

11   company does not participate in the illegal conduct and could not be held liable for it.[4]

          **B.     False Statements**

12        Henry's second theory of liability is based on allegedly false statements made in

13   McKesson's SEC filings and by certain senior executives at conferences and on earnings calls.

14   SAC ¶¶ 211–12.  As before, this theory of liability fails because Henry has not adequately pled

15   demand futility.

16        This Court rejected similar allegations in the FAC because it failed to allege

17   "particularized facts" showing that a majority of the Board "was involved in, prepared, or even

18   knew about the alleged misstatements and omissions."  Order at 8 (quoting In re Facebook, 367 F.

19   Supp. 3d at 1127).  Such allegations were necessary to create a reasonable doubt that a majority of

20   the Board was "disinterested and independent" as to Henry's claims premised on the alleged false

21   statements.  Id.

22        The SAC suffers the same flaw.  Henry has added no allegations that any Board member

United States District Court
Northern District of California

---

[3]  To the extent Henry argues that the Board adopted some other business plan premised on illegal conduct, see Reply (dkt. 67) at 7–9, that theory is utterly unsupported by the SAC's allegations.
[4]  This theory fails for the additional reason that, even if McKesson's directors could be held liable for knowingly profiting from other companies' price fixing, Henry fails to adequately allege that a majority of the Board was aware of the illegal agreements.  See infra Part III.B.  As a result, even if one accepts Henry's apparently novel theory of fiduciary duty, she cannot establish demand futility as to this claim.  See Rosenbloom, 765 F.3d at 1150.

was "involved in, prepared, or even knew about" the misstatements McKesson executives made on earnings calls and at conferences.  See SAC ¶¶ 179–206.  And while the SAC (like the FAC) alleges that the Audit Committee reviews McKesson's SEC filings, id. ¶ 174, that accounts for just four members of the relevant Board, see id. ¶¶ 27–30, 185.  Henry now alleges that the Audit Committee would have reported "the misleading omissions and misrepresentations in McKesson's securities filings . . . to the full board."  Id. ¶ 198.  But this conclusory allegation is insufficient to demonstrate the rest of the Board's liability for any misstatements in McKesson's SEC filings, because Delaware courts have rejected the "contention that knowledge on the part of any one board member can be imputed to other board members as a result of their shared board or committee service."  Desimone, 924 A.2d at 943.  Absent particularized allegations that this information was or necessarily would have been shared by the Audit Committee, their knowledge of purported misinformation in McKesson's SEC filings cannot be imputed to a majority of the Board and therefore does not establish demand futility.[5]

Henry's failure to adequately allege that a majority of the Board was so much as aware of the alleged misstatements is dispositive of these claims.  See Order at 8–9 (dismissing on these grounds).  But there is an additional reason the SAC does not adequately establish reasonable doubt that a majority of the Board faces a substantial likelihood of liability for the alleged false statements.  Even if Henry had plausibly alleged that the Board was aware of those statements, she has not adequately alleged that they would have known the statements were false.

Most of Henry's arguments and new allegations regarding demand futility attempt to demonstrate that a majority of the Board would have known of the price-fixing conspiracy that rendered misleading certain aspects of McKesson's SEC filings and statements by McKesson executives.  See Opp'n at 8–16; SAC ¶¶ 179–206.  This focus is misplaced since, as discussed above, this Court's prior Order dismissed for failure to allege that a majority of the Board was even aware of the misstatements.  But the inadequacy of Henry's arguments that a majority of the

---

[5]  This conclusion holds even if one assumes (without deciding) that Tyler is not disinterested and independent because he currently serves as McKesson's CEO.  See Opp'n at 6–7.  As Henry acknowledges, four members of the Audit Committee and Tyler add up to just five of the eleven relevant Board members.  Id. at 8.

United States District Court
Northern District of California

United States District Court
Northern District of California

Board would have recognized the misstatements as false even if they had been aware of them demonstrates an alternative basis for the conclusion that she has failed to adequately plead demand futility.

Henry focuses her arguments on Coles and Mueller, the only additional Board members (besides Tyler and the Audit Committee members) who sat on McKesson's Board when the alleged false statements were made.  See Opp'n at 8–16; see also SAC ¶¶ 23–34, 185.  She posits that various factors support an inference that at least one of the two men[6] "was aware of how McKesson's profits were, in reality, premised on illegal conduct and artificially inflated due to the ongoing antitrust conspiracy."  Opp'n at 8–9.  Henry's arguments are contrary to established case law and the allegations she identifies are insufficient to establish Coles or Mueller's knowledge, even when considered as a whole.

First, Henry emphasizes the size of the antitrust conspiracy and the importance of generic drug pricing to McKesson's business.  Id. at 9–10.  It is true that this Court has previously found the centrality of generic drug pricing to McKesson's business sufficient to impute knowledge of pricing trends to its officers.  See Order Denying Motion to Dismiss at 18–20, Evanston Police Pension Fund v. McKesson Corp., No. 3:18-cv-06525-CRB (N.D. Cal. Oct. 30, 2019), ECF No. 67.  But it has also found that the "core operations" theory of scienter is inapplicable to the demand futility analysis, which concerns itself with a company's directors.  In re Yahoo! Inc. S'holder Derivative Litig., 153 F. Supp. 3d 1107, 1123 n.10 (N.D. Cal. 2015).  The Ninth Circuit case Henry cites is distinguishable, because the importance of the relevant information to the corporation's business was accompanied by numerous more specific and direct allegations supporting the Board's knowledge.[7]  See Rosenbloom, 765 F.3d at 1151–57 (additional allegations included that the Board monitored the illegal conduct, received data related to that conduct, and

---

[6]  This argument betrays the weakness of Henry's position.  The demand futility analysis requires allegations "specific to each director."  Desimone, 924 A.2d at 943.  Evidence that purports to establish a statistical likelihood that one of two directors faces a substantial likelihood of liability is unlikely to satisfy this standard.

[7]  To the extent the out-of-circuit cases Henry cites accept a broader role for the "core operations" theory in the demand futility context, they are unpersuasive in light of this Court's prior holdings on the issue and the meaningful differences between officers and directors.  See Mot. at 12.

United States District Court
Northern District of California

1    received repeated FDA warnings about the illegal sales).  As explained below, the additional

2    allegations supporting Coles and Mueller's knowledge fall far short of those in <u>Rosenbloom</u>.

3         Henry's other arguments attempt to impute knowledge from McKesson's executive to its

4    directors.[8]  <u>See</u> Opp'n at 10–11, 13–15.  As a general matter, the Ninth Circuit has rejected

5    arguments that knowledge held by a company's officers may automatically be imputed to its

6    directors.  <u>Towers v. Iger</u>, 912 F.3d 523, 530 (9th Cir. 2018).  Henry's more specific allegations

7    do nothing to bridge the gap.  She points to Board meetings and reports which discussed topics

8    such as "branded and generic pricing pressure" and the "current competitive landscape."  Opp'n at

9    10–11, 13.  But the Ninth Circuit has held similar allegations that a general topic was discussed at

10   a board meeting insufficient to support an inference that the directors were aware of related

11   wrongdoing.  <u>Towers</u>, 912 F.3d at 531.  And while Henry attempts to distinguish <u>Towers</u>,[9] her

12   allegations are even more attenuated, because the cited Board meetings occurred <u>after</u> the alleged

13   false statements were made.  <u>See</u> SAC ¶ 195.  She depends on an additional, conclusory allegation

14   that "[i]t is also reasonable to infer that similar discussions took place at board meetings . . . in

15   2014, 2015, and 2016."  <u>Id.</u> ¶ 196.  Neither layer of inference is plausible.  Henry's reliance on

16   board meetings to impute executive knowledge to director defendants is doubly inadequate.

17        Finally, Henry argues that because McKesson's Corporate Governance Guidelines required

18   directors to "assur[e] that the Company's management and employees operate in a legal and

19   ethically responsible manner" and familiarize themselves with "the Company's business, strategic

20   plans, significant financial, accounting, and risk management issues, [and] compliance programs,"

21   it may be assumed that Coles and Mueller were aware of generic drug price-fixing agreements.

22   Opp'n at 14–15 (citing SAC ¶¶ 169, 172).  It is true that corporate governance guidelines may

23

24   _____

[8]  Henry also points out that Mueller and Coles were named as defendants in unrelated litigation
involving illegal sales of opioids.  Opp'n at 12.  Since Henry herself acknowledges this evidence
25   is "not dispositive to the present litigation," <u>id.</u>, she seems to recognize that it provides little or no
support for her position.

26   [9]  Henry's citation to <u>Wal-Mart Stores, Inc. v. Indiana Electrical Workers Pension Trust Fund
IBEW</u>, 95 A.3d 1264, 1273 (Del. 2014), is wholly inapposite.  That case held only that the Court
27   of Chancery properly ordered Wal-Mart to produce certain officer-level documents, because those
documents could have established that the officers did report the relevant information to the
28   Board.  <u>Id.</u>  Its logic assumes that wholesale imputation of officer-level knowledge to board
members would be improper.  <u>See id.</u>

support an inference of knowledge on the part of corporate directors when they mandate that the specific information relevant to the plaintiff's claims be reported to the board.  See, e.g. In re Pfizer Inc. S'holder Derivative Litig., 722 F. Supp. 2d 453, 461–62 (S.D.N.Y. 2010).  But that is not the case here.  Henry relies on general requirements that the Board familiarize itself with McKesson's business.  Alleging that those requirements support an inference that Coles and Mueller were aware of the price-fixing agreements is simply a repackaged version of the argument that they must have known of the agreements because the agreements were important to McKesson's business.

The allegations that Henry relies on to show that Mueller and Coles knew of the alleged price-fixing agreements are untenably weak.  Even taken together, they do not plausibly support the inference that Mueller and Coles would have recognized the alleged misstatements as such, even assuming, counterfactually, that they were aware of said misstatements at all.

## IV.   CONCLUSION

For the foregoing reasons, the motion to dismiss is granted.  Because this is Henry's third attempt to plead these allegations, and she has made little and in some cases no effort to remedy the deficiencies identified in this Court's prior order, dismissal is with prejudice.  See Leadsinger, 512 F.3d at 532 ("repeated failure to cure deficiencies by amendments previously allowed" justifies dismissal with prejudice (internal quotation marks and citations omitted)).

**IT IS SO ORDERED.**

Dated: July 1, 2020



CHARLES R. BREYER
United States District Judge